1  John H. Gomez (SBN 171485)
   John P. Fiske (SBN 249256)
2  Deborah S. Dixon (SBN 248965)
   **GOMEZ TRIAL ATTORNEYS**
3  655 West Broadway Suite1700
   San Diego, CA 92101
4  Telephone:  (619) 237-3490
   Fax:  (619) 237-3496
5
   Attorneys for Plaintiffs
6

7

8                    **UNITED STATES DISTRICT COURT**

9                 **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  MICHAEL CUNNINGHAM and           CASE NO. 3:15-CV-00124
    ELIBORIO VALENZUELA,
12  individually and on behalf of all others   **SECOND AMENDED CLASS**
    similarly situated,                **ACTION COMPLAINT FOR:**
13
                  PLAINTIFFS,          1.  Breach of Express Warranty;
14
       v.                             2.  Breach of Implied Warranty;
15
    FORD MOTOR COMPANY, and           3.  Violation of the Magnuson-Moss
16  DOES 1 through 100, inclusive     Warranty Act 15 U.S.C. § 2301, *et seq.*;
17                DEFENDANT.           4.  Violation of CAL. BUS. & PROF.
                                       CODE § 17200, *et seq.*;
18
                                       5.  Violation of CAL. BUS. & PROF.
19                                     CODE § 17500, *et seq.*;
20                                     6.  Violation of the Consumers Legal
                                       Remedies Act, CAL. CIV. CODE § 1750,
21                                     *et seq.*
22
23                                     **JURY TRIAL DEMANDED**
24

25

26

27

28

Plaintiffs Michael Cunningham and Eliborio Valenzuela, on behalf of themselves and all other persons similarly situated, bring this action against defendant Ford Motor Company and, to the best of their knowledge, information and belief, formed after an inquiry reasonable under the circumstances, alleges as follows:

## NATURE OF THE ACTION

1.     This is a consumer action on behalf of plaintiffs and a class of other similarly situated California consumers against defendant Ford, the manufacturer of the Explorer. Between 2011 to 2015, Ford Explorers were built on the same platform with common parts. This model has a distinct and dangerous characteristic: It leaks exhaust emissions (which includes carbon monoxide) into its passenger cabin.

2.     The potential exposure to exhaust and carbon monoxide renders these vehicles unsafe to drive.

3.     Ford has known about this problem since 2012.

4.     In about 2012, Ford issued Technical Service Bulletin 12-12-4 ("TSB 12-12-4"), titled "Explorer Exhaust Odor in Vehicle," acknowledging that "[s]ome 2011-2013 Explorer vehicles may exhibit an exhaust odor in the vehicle with the auxiliary climate control system on. Customers may indicate the odor smells like sulfur." Ford's TSB 12-12-4 provides instructions which Ford claims will correct the exhaust odor in 2011 through 2013 model year Ford Explorers.

5.     Subsequent to TSB 12-12-4, Ford issued Technical Service Bulletin 14-0130 ("TSB 14-0130").

6.     Titled "Exhaust Odor in Vehicle," TSB 14-0130 also acknowledges an exhaust odor in Explorer vehicles, and adds the 2014 and 2015 model year Explorers to the list of affected vehicles.  TSB 14-0130 includes the same or similar service procedures outlined in TSB 12-12-4, and adds certain procedures not included in TSB 12-12-4.

7.     Ford's TSBs 12-12-4 and 14-0130, however, do not correct the condition. Ford has serviced thousands of vehicles around the world under TSBs 12-12-4 and 14-

0130, generally without success in eliminating the exhaust leak. Ford has bought back hundreds of vehicles around the world, mostly overseas, because it has been unable to fix the leak. Ford has attempted a variety of fixes, all without success.

8. Ford's TSBs 12-12-4 and 14-0130 fail to acknowledge that carbon monoxide may enter the passenger compartment of affected vehicles. Ford's TSBs 12-12-4 and 14-0130 are provided to authorized dealerships, and do not directly notify non-Ford automotive repair facilities about the defects associated with TSBs 12-12-4 and 14-0130. Further, although Ford has received numerous complaints relating to exhaust entering the passenger compartments of 2011 through 2015 model year Ford Explorers, Ford has not provided any notice to plaintiffs or the proposed class members about the defect and the potential exposure to dangerous carbon monoxide in the 2011 through 2015 model-year Ford Explorers.

9. The systemic nature of the exhaust leakage and the inability of Ford to find a fix have been conceded by a Ford representative, under oath, at a non-binding arbitration concerning a claim made by a Ford Explorer owner that his car was leaking exhaust into the passenger cabin. In urging that the arbitrator rule against the vehicle owner, the Ford representative testified on January 2, 2015 (a true and correct copy of this transcript is attached as Exhibit "C" to this Second Amended Complaint):

   **A.** **"It seems to be happening across the only -- across the design line. They can't -- so then it really is a design issue, not a problem with this particular vehicle."** Exhibit C at 50:2–6.

   **B.** **"There is another fine line there that, you know, this is happening across the -- the Explorers over a number of years. It -- it doesn't seem to be a problem with an individual part or an individual vehicle that was misbuilt. It does seem to be a design issue."** Exhibit C at 83:13–18.

   **C.** **"And then, in terms of -- of repairs, as I said, we're working on it. I wish I had a better answer for that. I don't, and I can only apologize on behalf of Ford for that, because, you know, it's obviously taking longer than anybody wants, especially our customers who have the vehicle."** Exhibit C at 51:2–8.

**D.    "In terms of the request for repairs, as soon as we can get it -- get them done, as soon as we have a robust fix, something that's going to actually do the job, we would love to get it done.  That should be very soon. I know that that's what the customer was told, you know, all those months ago; but we do feel that we've taken steps along the way. We have come out with the two technical service bulletins trying to address it, and we do want to get it fixed.  So we are not saying no to a repair; we are just saying we have to have the fix first."** Exhibit C at 84:25–85:12.

10.    Ford sold or leased hundreds of thousands of defective vehicles nationwide.  Each such vehicle was sold or leased in a dangerous and defective condition because each such vehicle contains design or manufacturing flaws, and/or an exhaust and/or HVAC system that permit(s) exhaust and other gases, including toxic carbon monoxide, to enter the passenger compartment during the normal and customary use of such vehicles.

11.    Ford designed, manufactured, sold and leased the 2011 through 2015 model year Ford Explorer when it knew or should have known of such defects, or Ford otherwise learned of such defects and failed to notify plaintiffs and the proposed class members of the defect in the 2011 through 2015 model year Ford Explorers that exposed plaintiffs, the proposed class members, and others, to a life safety hazard.

12.    Plaintiffs and the members of the proposed classes reasonably expect to have their Ford vehicles operate in a normal and customary manner free from exposure to potentially noxious and potentially deadly exhaust gases entering the vehicle's cabin during normal and expected use.

## JURISDICTION AND VENUE

13.    This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000, exclusive of interest and costs, there are more than 100 class members, and more than two-thirds of the class is diverse from Ford.

///

///

14.    The Court has personal jurisdiction over Ford because Ford conducts substantial business in this District, and some of the actions giving rise to this complaint took place in this District.

15.    Venue is proper in this District under 28 U.S.C. § 1391 because, among other things, a substantial part of the events or omissions giving rise to the claims occurred in this District, and caused harm to class members residing in this District.

16.    Plaintiff Michael Cunningham is a resident and citizen of Temecula, California, but understands this litigation is better suited in the Southern District of California because of Defendant's contacts in this District. Plaintiff has signed a Venue Affidavit pursuant to Civil Code Section 1780(d), attached hereto as Exhibit A.

17.    Plaintiff Eliborio Valenzuela is a resident and citizen of Montebello, California, but understands this litigation is better suited in the Southern District of California because of Defendant's contacts in this District.

## PARTIES

18.    Plaintiff Michael Cunningham is a resident of Temecula, California.

19.    Plaintiff Eliborio Valenzuela is a resident of Montebello, California.

20.    Defendant, Ford Motor Company, is a Delaware corporation with its principal place of business in Michigan.  In this Complaint, "Ford" refers to the named defendant and all related, successor, predecessor, parent, and subsidiary entities to which these allegations pertain.

21.    Plaintiff does not know the true names and capacities of defendants sued as Does 1 through 100.  Plaintiff will amend the complaint to show the true names of each such defendant when the identities have been ascertained.  Each defendant acted as the agent, employee, representative, partner, joint venture, or co-conspirator of each of the other defendants in the commission of the acts alleged herein, and acted within the course and scope of its duty as such agent, employee, representative, partner, joint venture, or co-conspirator.  The acts of each such defendant were authorized or ratified

by each other defendant, and together constitute a single and continuing course of conduct.

### PLAINTIFF MICHAEL CUNNINGHAM'S INDIVIDUAL ALLEGATIONS

22.    In or about August of 2012, plaintiff Michael Cunningham purchased a new 2013 Ford Explorer from an authorized Ford dealership in San Diego, California.

23.    The 2013 Ford Explorer purchased by Cunningham was dangerous and defective when purchased because its design and exhaust and/or HVAC systems permitted an exhaust odor, exhaust and other gases, including carbon monoxide, to enter the passenger compartment of the vehicle.  The defect is latent in nature because it is not obvious or ascertainable upon reasonable examination or inspection.

24.    At the time of the purchase, Cunningham was not notified that the 2013 Ford Explorer he was purchasing was defective, nor was he notified that he and all occupants would be exposed to carbon monoxide and other potentially dangerous gases while driving in his 2013 Ford Explorer during its normal and customary use.

25.    Cunningham brought his 2013 Ford Explorer in for service to both the North County Ford Dealership in San Diego, California and the Rancho Ford Dealership in Temecula, California on multiple occasions.

26.    Cunningham has discovered that the carbon monoxide levels within his Ford vehicle are higher than the ambient carbon monoxide levels outside his vehicle while the vehicle is operated in a normal and customary manner.

27.    Carbon monoxide is an odorless, colorless, and tasteless gas that is toxic to humans.

28.    Cunningham took his 2013 Ford Explorer in for service at the Rancho Ford dealership in January of 2015.  Rancho Ford tested the vehicle and concluded that carbon monoxide was entering the passenger compartment of Cunningham's 2013 Ford Explorer while the vehicle was operating in a normal and customary manner.

29.     Cunningham was informed by Rancho Ford that the dealership would attempt to remedy this dangerous and potentially life-threatening carbon monoxide leak by performing TSB 14-0130.

30.     Cunningham was further informed by Rancho Ford that the dealership would indeed not cover the cost of the repair of the dangerous carbon monoxide leak because Cunningham was outside of his warranty.  Thus, Cunningham would have to pay out of pocket to repair the dangerous carbon monoxide leak.   Cunningham was then forced to agree to pay for the repairs at the price Ford provided to him.

31.     To date, Ford has not acknowledged to Cunningham or the members of the proposed class that the 2011 through 2015 model year Ford Explorers contain design flaws and/or defective exhaust and/or HVAC systems permitting exhaust, carbon monoxide and other potentially dangerous gases into the passenger compartments of those vehicles.

## PLAINTIFF ELIBORIA VALENZUELA'S INDIVIDUAL ALLEGATIONS

32.     In or about June of 2013, plaintiff Eliborio Valenzuela leased a new 2013 Ford Explorer from Cerritos Ford, an authorized Ford dealership located in Cerritos, California.

33.     The 2013 Ford Explorer leased by Valenzuela was dangerous and defective when purchased and delivered to Valenzuela because its design and exhaust and/or HVAC systems permitted an exhaust odor, exhaust and other gases, including carbon monoxide, to enter the passenger compartment of the vehicle. The defect is latent in nature because it is not obvious or ascertainable upon reasonable examination or inspection and only manifests during operation once placed into normal usage.

34.     At the time of the lease, Valenzuela was not notified that the 2013 Ford Explorer was defective, nor was he notified that he and all occupants, including his children, would be exposed to noxious carbon monoxide and other potentially dangerous gases while driving in the 2013 Ford Explorer during its normal and customary use.

35.     Valenzuela first discovered the presence of exhaust in the passenger cabin within about a month of purchasing the vehicle, when he had driven the vehicle fewer than 2,700 miles.  In about August of 2013, with about 2,700 miles on the vehicle, Valenzuela brought his 2013 Ford Explorer to Cerritos Ford and complained about exhaust entering the passenger cabin. At that time, Valenzuela's vehicle was well within the 3 year/36,000 mile warranty period. The service representative at Cerritos Ford told Valenzuela that his experience was the result of the vehicle being new, and that it would fix itself by about 5,000 miles.

36.     Valenzuela continued to experience an exhaust odor inside the passenger cabin of his 2013 Ford Explorer even after he had driven the vehicle 5,000 miles.

37.     Valenzuela returned his 2013 Ford Explorer to Cerritos Ford on several occasions for service, and repeatedly complained of an exhaust odor inside the passenger cabin. Cerritos Ford never repaired the vehicle to fix to the exhaust odor leaking into the passenger cabin of the vehicle.

38.     In about June 2015, Valenzuela brought his 2013 Ford Explorer to Ford of Montebello, when the vehicle had 25,930 miles on it and was still within the 3 year/36,000 mile warranty period. Valenzuela complained that exhaust fumes were entering the passenger cabin of his vehicle. Ford of Montebello kept Valenzuela's Ford Explorer for approximately two weeks. Ford of Montebello failed to fix the exhaust leakage problem.

39.     To date, Ford has failed to fix Valenzuela's 2013 Ford Explorer.

## GENERAL ALLEGATIONS

### Ford's Sale and Lease of Defective and Dangerous Vehicles

40.     Ford began selling and leasing a new generation of Ford Explorers – considered the fifth generation of Explorer vehicles – with the 2011 model year Ford Explorer.

41.     The subsequent model year Ford Explorers are not dramatically different in design from the 2011 model year Ford Explorer, and the Explorers sold today are considered part of the "fifth generation" of Ford Explorer vehicles.

42.     The 2011 through 2015 model year Ford Explorers were designed, engineered and manufactured by Ford with design flaws and/or defective manufacturing relative to the exhaust and/or HVAC systems, which permit carbon monoxide and exhaust to enter into the passenger compartments of those vehicles while being driven in a normal and customary manner.

43.     Ford designed, manufactured, assembled, inspected, distributed, sold, and leased the 2011 through 2015 model year Ford Explorers in a manner so as to render the subject vehicles defective and unsafe for their intended use and purpose by, among other things:

(a) Designing the vehicles such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of the vehicles;

(b) Designing the bumpers and/or tailpipes on the vehicles such that exhaust and other gases, including carbon monoxide, may accumulate behind the bumper and within the interior and exterior panels, allowing those gases to permeate the passenger compartments of the vehicles;

(c) Designing, manufacturing and assembling the vehicles using defective rear air extractors which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(d) Designing, manufacturing and assembling the liftgates in the rear of the vehicles using defective drain valves, which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(e) Designing, manufacturing and assembling the vehicles with sheet metal panels and overlaps which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(f) Designing, manufacturing and assembling the vehicles with joints and seams which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles; and,

(g) Designing, manufacturing and assembling the vehicles with rear auxiliary air conditioning system parts which are defectively designed and/or located too close in proximity to the driver side rear air extractor, such that exhaust and other gases, including carbon monoxide, may enter the auxiliary air conditioning system and the passenger compartments of the vehicles.

44.     Ford knew or should have known that the 2011 through 2015 model year Ford Explorers were dangerous and defective such that drivers and passengers of those vehicles may be exposed to carbon monoxide and other dangerous gases while the vehicles are in operation.

45.     The defective vehicles were sold or leased pursuant to express and implied warranties.  At the time the defective vehicles were sold or leased by Ford directly and through its authorized agents, the vehicles were in violation of express and implied warranties. All of the defective vehicles are still within the effective dates of the express warranties, or the time or mileage limits in the express warranties should be inapplicable given Ford's fraudulent conduct, among other factors.

46.     In promoting, selling and repairing its defective vehicles, Ford acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Ford representatives and agents.  That the dealers act as Ford's agents is demonstrated by the fact that: (i) the warranties provided by Ford for the defective vehicles directs consumers to take their vehicles to authorized dealerships for repairs or services; (ii) Ford dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers; (iii) Ford directs its authorized dealers as to the manner in which they can respond to complaints and inquiries concerning defective vehicles; and (iv) Ford has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public.

GOMEZ
TRIAL ATTORNEYS

47.    Ford's control over the actions of its dealers is also evidenced by its implementation of the company's express and implied warranties as they relate to the defects. Authorized Ford dealerships are instructed by Ford to address complaints of an exhaust odor by prescribing and implementing TSBs 12-12-4 and 14-0130. Implementation of the TSBs is not triggered by complaints of carbon monoxide entering the passenger cabin.

**Ford Acknowledged the Subject Vehicles' Defective Condition in TSBs 12-12-4 and 14-0130**

48.    In response to customer complaints of an exhaust odor in the passenger compartments of the subject vehicles, Ford issued TSB 12-12-4 in December 2012. TSB 12-12-4 was intended to provide instructions to authorized Ford dealerships to correct the presence of an exhaust odor in 2011 through 2013 model year Ford Explorers.

49.    In July 2014, Ford issued TSB 14-0130, which added 2014 and 2015 model year Explorers to the list of affected vehicles.  TSB 14-0130 was intended to provide instructions to authorized Ford dealerships to correct the presence of an exhaust odor in 2011 through 2015 model year Ford Explorers.

50.    Even after issuing TSBs 12-12-4 and 14-0130, Ford did not inform plaintiffs or the members of the proposed class of the defects in 2011 through 2015 model year Ford Explorers, despite the fact that those defects presented health and life safety issues to occupants of the vehicles.

51.    Notably, TSBs 12-12-4 and 14-0130 fail to disclose that the exhaust odor acknowledged therein is accompanied in the passenger compartment by toxic and potentially lethal carbon monoxide and other gases.

52.    At all material times, Ford has failed to inform customers who purchased and/or leased 2011 through 2015 model year Ford Explorers that they are unsafe for operation or that they were designed, engineered and manufactured such that exhaust

and other gases, including carbon monoxide, may enter the passenger compartments of such vehicles.

**Ford's TSBs 12-12-4 and 14-0130 Fails to Repair the Defects**

53.     Ford's TSBs 12-12-4 and 14-0130 fail to repair or rectify the exhaust odor and fumes intrusion problem, and vehicles that have received the repairs outlined in TSBs 12-12-4 and 14-0130 may continue to have exhaust and other gases, including toxic and potentially lethal carbon monoxide, enter the passenger compartment.

54.     TSBs 12-12-4 and 14-0130 identify flaws in the initial design and manufacture of the 2011 through 2015 model year Ford Explorer, and prescribe repairs and/or replacements that are inadequate and equally flawed and defective.

55.     In TSBs 12-12-4 and 14-0130, Ford requires installation or use of the following replacement parts in the subject vehicles, among others: (i) a dual rate air extractor (part number BB5Z-61280B62-A under TSB 12-12-4 and part number BB5Z-61280B62-B under TSB 14-0130); (ii) valve assembly auto drains (part number 4M8Z-54280B62-A); and (iii) Motorcraft® Seam sealer (part number TA-2).

56.     The replacement parts and service, however, fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger cabins of the subject vehicles.

57.     The problem common to the Explorer models results from primarily three facts.

58.     The first fact is that engine exhaust tends to splash against the rear outside liftgate of the car. This tends to worsen at higher speeds.

59.     The second fact is the subject Ford models are not remotely airtight. Part of this is intentional. Drainholes are cut into the cars' rear liftgates; just as water can run down these holes, exhaust can float up through them. Moreover, part of this particular problem results from poor workmanship and inferior products: the rubber mounting that cushions the liftgate window against the liftgate itself is not airtight; gaps caused by poor placement and inconsistent use of adhesive leaves observable gaps. In addition, the

cars at issue have air extractors built above the rear tires. These extractors are supposed to act like check valves and modulate the flow of air, and air pressure, in the passenger cab. But the flaps on the extractors are poorly made. They stiffen and curl and don't sit flat over the extractor's opening when they should.

60.     The third fact is that at certain air conditioning settings – and especially when the air conditioning is set at maximum (which causes the air inside the cabin to recycle) – the air pressure inside the passenger cabin drops.

61.     The result of these factors is that the vehicles' engine exhaust, which tends to build up against the rear liftgate at high speeds, is pulled into the passenger cabin through the many holes and gaps in the back end of the car because the pressure inside the cab is less than the pressure outside.

**Ford's Deceptive Practices, Unlawful Conduct, and Unfair Competition**

62.     Ford engaged in a systematic scheme to not disclose or notify consumers of the defects and continue marketing, leasing, and selling its defective Ford Explorers, by engaging in the following practices:

a. Ford, directly and through its salespeople and agents, has continued to inform potential purchasers of Ford Explorer vehicles that those vehicles are safe and fit for the use for which they were intended.

b. Ford provided, disseminated, marketed and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the performance, reliability, quality and nature of the subject vehicles.

c. Ford represented that goods or services were of a particular standard, quality or grade, when they were of another.

d. Ford engaged in unconscionable commercial practices by failing to reveal material facts and information about the subject vehicles, which did, or tended to mislead plaintiffs and the members of the class about facts that could not reasonably be known by the consumer.

e.  Ford caused plaintiffs and the members of the class to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct.

f.  Ford failed to reveal material facts to plaintiffs and the members of the class with the intent that plaintiffs and the members of the class rely upon the omission.

g.  Ford made material representations and statements of fact to plaintiffs and members of the class that resulted in plaintiffs and members of the class reasonably believing the represented or suggested state of affairs to be other than what they actually were.

h.  Ford has known of the exhaust and carbon monoxide problem, but has failed to disclose its existence or its complete nature, even though Ford has known that such information was material to, among other things, those transactions in which plaintiffs and the members of the class purchase the subject vehicles and each of their decisions to continue operating the vehicle.

i.  Ford intended that plaintiffs and the members of the class rely on their misrepresentations and omissions, so that plaintiffs and the members of the class would purchase or lease the subject vehicles, and continue to operate the subject vehicles.

63.   Ford continued to sell or lease the subject vehicles without informing buyers or lessees of the defects in the vehicles.

**Ford's Conduct and/or Inaction Has Damaged Plaintiff and Members of the Proposed Class**

64.   Plaintiffs and each member of the proposed class have sustained ascertainable losses and damages in connection with their lease or purchase of the vehicles.

65.     Plaintiffs and each class member have not received what he or she paid for: a car that can be safely and comfortably driven without the presence of exhaust fumes in the cabin.

66.     Plaintiffs and the class members have been damaged by Ford's conduct and/or inaction, as they have been exposed to harmful carbon monoxide and exhaust, they unknowingly leased or purchased defective vehicles that cannot be safely operated, they have been forced to pay, or will pay, substantial amounts of money to repair the vehicles, if a repair can be made, and the value of their affected vehicles has been diminished because of this defect.

67.     A vehicle containing the defect described – that is, a defect that permits the entry of carbon monoxide and other gases into the passenger compartment of the vehicle – is worth less than a vehicle free from such defect.  Given that the defect renders driving the subject vehicles a health hazard that is potentially deadly, the vehicles are valueless.  At the time plaintiffs purchased and leased their vehicles, they paid a price based on the value of such a vehicle free of such defect.

68.     Plaintiffs and the class have been damaged and are entitled to compensation because (a) they overpaid (whether through purchase price or lease cost) for the car and (b) their Explorers' value has diminished due to the defect.

## CLASS ACTION ALLEGATIONS

69.     Plaintiffs seek to bring this case as a class action, pursuant to Fed. R. Civ. P. 23(a)(1)-(4) and (b)(2) and/or (b)(3). The proposed class is as follows:

> All persons who purchased or leased directly from a Ford authorized dealer in California at least one of the following vehicles: 2011 Ford Explorer, 2012 Ford Explorer, 2013 Ford Explorer, 2014 Ford Explorer or 2015 Ford Explorer.

70.     **Numerosity**.  Members of the class are so numerous that individual joinder of all members is impracticable.  Based upon information and belief, Ford has sold or leased tens of thousands of 2011 through 2015 model year Ford Explorers in California.

GOMEZ
TRIAL ATTORNEYS

SECOND AMENDED CLASS ACTION COMPLAINT

All of these vehicles are covered by TSB 12-12-4, and contain a defect that may cause carbon monoxide or exhaust to enter the passenger compartments of such vehicles.

71.    **Existence of Common Questions of Law and Fact**.  Common questions of law and fact exist as to all members of the class.  These include, but are not limited to: whether the 2011 through 2015 model year Ford Explorers have been sold or leased subject to express and/or implied warranties; whether the 2011 through 2015 model year Ford Explorers are defective such that carbon monoxide and exhaust may enter the passenger compartments of such vehicles; whether the 2011 through 2015 model year Ford Explorers suffer from a design defect, are unreasonable dangerous and/or are unfit for their intended use; whether Ford has knowledge of such defect; when Ford learned of such defect; whether Ford failed to disclose the defect to plaintiff and the class; whether Ford misrepresented that the affected vehicles were safe; whether Ford has a fix to the defect and, if so, how much the fix will cost; whether the defect reduces the value of the affected vehicles; whether Ford's express warranties cover the latent defects; whether Ford breached its warranties made to plaintiff and the class; whether Ford negligently designed/engineered/manufactured the affected vehicles; whether Ford concealed the defect; and whether plaintiff and the class have suffered damages as a result of the conduct alleged, and if so, the measure of such damage.

72.    **Typicality**.  The claims of plaintiffs are typical of the claims of the class, as plaintiffs and the members of the class have purchased or leased defective vehicles and have been harmed in some manner by Ford's conduct.

73.    **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs' interests do not conflict with the interests of the members of the class. Further, plaintiffs have retained counsel competent and experienced in complex class action litigation.  Plaintiffs and their counsel are committed to vigorously prosecuting this action.

74.    **Predominance and Superiority**.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since

joinder of all the individual class members is impracticable.  Questions of law and fact common to the members of the class predominate over any questions affecting only individual members. Likewise, because the damages suffered by each individual class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

75.    The prosecution of separate actions by the individual class members would also create a risk of inconsistent or varying adjudications for individual class members, which would establish incompatible standards of conduct for Ford. The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member. Further, plaintiffs anticipate no difficulty in the management of this litigation as a class action.

76.    For all of the foregoing reasons, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

## BREACH OF EXPRESS WARRANTY

77.    Plaintiff Eliborio Valenzuela repeats and re-alleges the allegations in Paragraphs 1 through 76 as if fully set forth herein.

78.    This count is brought on behalf of the class.

79.    For each defective vehicle sold by Ford, an express written warranty was issued which covered the vehicle, warranting the vehicle to be free of defects in materials and workmanship at the time of delivery.

80.    Ford's express warranties are intended to benefit the customer, including plaintiffs and the members of the class.

81.    At all relevant times, Ford was and is a merchant with respect to motor vehicles.  As an express warrantor and manufacturer and merchant, Ford had certain

1  obligations to conform the subject 2011 through 2015 model year Ford Explorers to the

2  express warranties given by Ford.

3      82.   When Plaintiff Valenzuela and members of the class purchased and/or

4  leased their 2011 through 2015 model year Ford Explorers, Ford expressly warranted

5  that the vehicles would be free from defects in design, material and workmanship.  Ford

6  promised to pay for all repairs and parts to replace defects introduced during the design

7  and manufacturing process.

8      83.   Plaintiff Valenzuela, and the members of the class, relied upon Ford's

9  express warranties, and the existence of such warranties, when purchasing or leasing the

10  vehicles.

11      84.   Ford breached its express warranties by offering for sale, and selling or

12  leasing as safe, defective vehicles that were by design and construction unsafe, thereby

13  subjecting occupants of the defective vehicles purchased or leased by plaintiff and

14  members of the class to the risk of injury or death.

15      85.   The defect at issue in this litigation was present in the subject vehicles at

16  the time of sale or lease to plaintiffs and the members of the class.

17      86.   The defect at issue in this litigation must be corrected by Ford, and the

18  expenses of such repairs must be borne by Ford, per Ford's express warranties.

19      87.   Ford breached its express warranties (and continues to breach its express

20  warranties) because it has not fixed the defect causing carbon monoxide and exhaust to

21  enter the passenger compartment of the subject vehicles, nor has it covered the expenses

22  associated with correcting the defect.

23      88.   Moreover, Ford has acknowledged it cannot fix the defect. Because Ford

24  cannot, and has not, developed an actual fix for the defect present in its vehicles, its

25  warranty failed its essential purpose. "If the remedy promised by the seller is so hollow

26  or ineffectual as to be meaningless, then the warranty fails of its essential purpose and

27  the customer is not bound by limitations of remedy contained therein." *Genchev v.*

28

*Detroit Diesel Corp.*, 608 Fed. Appx. 478 (9th Cir. 2015) quoting *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 970 (N.D. Cal. 2014).

89.     Plaintiff Valenzuela and the members of the class have performed the duties required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Ford or by operation of law in light of Ford's conduct described throughout this Complaint.

90.     Any arbitration or class waiver provisions included in Ford's express warranties are substantively and procedurally unconscionable, and therefore, unenforceable.

91.     Plaintiff Valenzuela and the members of the class took reasonable steps to notify Ford within a reasonable time that the 2011 through 2015 model year Ford Explorers were not as represented, whether or not Ford received such notice.

92.     Ford has received timely notice regarding the problems at issue in this litigation, and notwithstanding, Ford has failed and refused to offer an effective remedy.

93.     Plaintiff Valenzuela and the members of the class have been harmed and suffered damages caused by Ford's breach of the express warranties and are entitled to recover compensatory damages, including but not limited to the cost of repairs and diminution in value.

94.     The failure of the 2011 through 2015 model year Ford Explorers to be as represented was a substantial factor in causing Plaintiffs and the members of the class harm and damages.

## COUNT II

## BREACH OF IMPLIED WARRANTY

### (C.A. U.C.C. § 2-314)

95.     Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 94 as if fully set forth herein.

96.     This Count is brought on behalf of the class.

GOMEZ
TRIAL ATTORNEYS

SECOND AMENDED CLASS ACTION COMPLAINT

97.     At all relevant times, Ford was and is a merchant with respect to motor vehicles.

98.     Ford impliedly warranted that the subject vehicles, which Ford designed, manufactured, sold or leased, were merchantable, fit for the ordinary purposes for which they were intended to be used, and were not otherwise injurious to consumers.  The ordinary purpose for which the subject vehicles are used is, among other things, to drive in a manner that does not unnecessarily and unreasonably expose occupants to needless harm or risk.

99.     Ford breached its implied warranty of merchantability when it designed, manufactured, distributed, sold and leased the 2011 through 2015 model year Ford Explorers in an unsafe and un-merchantable condition.  The subject vehicles threaten to expose occupants to carbon monoxide and other dangerous gases while the vehicles are being driven in a normal and customary manner.

100.    Plaintiffs and each of the members of the class have had sufficient direct dealings with either Ford or its agent dealerships to establish privity of contract between Ford, on the one hand, and plaintiffs and each of the members of the class, on the other hand.   Notwithstanding, privity is not required because plaintiffs and each of the members of the class are the intended beneficiaries of Ford's written warranties and its contractual relationships with Ford dealerships. The dealers were not intended to be the ultimate consumers of the subject vehicles, and have no rights under the warranty agreements provided by Ford.   Ford's express warranties were designed for and intended to benefit the consumers only.  Plaintiffs and the members of the class were the intended consumers of the subject vehicles.

101.    Plaintiffs allege based on the faulty design, Ford's documents and its TSB reports that the defect existed at the time Ford sold the vehicles to Plaintiffs.

102.    Plaintiffs and the members of the class have suffered damages caused by Ford's breach of the implied warranty of merchantability and are entitled to recover

compensatory damages, including but not limited to the cost of repairs and diminution in value.

## COUNT III

## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

### (15 U.S.C. § 2301, *et seq.*)

103.   Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 102 as if fully set forth herein.

104.   This Count is brought on behalf of the class.

105.   Plaintiffs are a "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

106.   Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

107.   The subject 2011 through 2015 model-year Ford Explorers are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

108.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by, among other things,  the failure of a warrantor to comply with written or implied warranties.

109.   Ford sells and leases its vehicles subject to express warranties which are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).   Ford additionally sells and leases its vehicles subject to implied warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

110.   When plaintiffs and members of the class purchased and/or leased their 2011 through 2015 model year Ford Explorers, Ford expressly warranted that the vehicles would be free from defects in design, materials and workmanship.   Ford promised to pay for all repairs and parts to remedy defects introduced during the design and manufacturing process.

111.   When plaintiffs and members of the class purchased and/or leased their 2011 through 2015 model year Ford Explorers, Ford impliedly warranted that the vehicles were merchantable, fit for the ordinary purposes for which they were intended to be used, including the guarantee that they were in a safe and non-defective condition for use by owners and lessees, and were not otherwise injurious to consumers.  Ford was under a duty to design, construct, manufacture, inspect and test the vehicles so as to make them suitable for the ordinary purpose of their use.

112.   The 2011 through 2015 model year Ford Explorers share a common defect in that they have been designed and manufactured such that exhaust and other gases, including carbon monoxide, may enter the passenger compartment of such vehicles during their normal and customary use.   Ford is aware of the defect, and has acknowledged the problem of an exhaust odor inside the passenger compartment of such vehicles by its issuance of TSBs 12-12-4 and 14-0130.  However, TSBs 12-12-4 and 14-0130 do not disclose the presence of carbon monoxide inside the passenger compartment of the subject vehicles, nor do they fix the problem of exhaust and other gases entering the passenger compartment.  Ford has breached its express and implied warranties by failing to disclose a life safety defect in the subject vehicles, by failing to fix the defects in the subject vehicles, and by selling or leasing vehicles which are unsafe and unfit for the ordinary purposes for which they are intended to be used.

113.   Plaintiffs and each of the members of the class have had sufficient direct dealings with either Ford or its agent dealerships to establish privity of contract between Ford, on the one hand, and plaintiffs and each of the members of the class, on the other hand.  Notwithstanding, plaintiffs and each of the members of the class are the intended beneficiaries of Ford's express and implied warranties.  The dealers were not intended to be the ultimate consumers of the subject vehicles, and have no rights under the warranty agreements provided by Ford.   Ford's warranties were designed for and intended to benefit the consumers only.

114.   Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.   Ford has known, or should have known, or was reckless in not knowing of its misrepresentations or omissions concerning the subject vehicles' defect resulting in exhaust and other gases, including carbon monoxide, entering the passenger compartment of such vehicles. Notwithstanding, Ford has failed to disclose the existence of this defect and the risk of carbon monoxide exposure, and has failed to rectify the situation.   Plaintiffs, on numerous occasions, afforded Ford an opportunity to cure by bringing his vehicle into an authorized Ford dealership for service.   Notwithstanding, the defects in plaintiffs' vehicle were not repaired.   Neither TSB 12-12-4 nor TSB 14-0130 repairs the defect. Under the circumstances, any requirement that plaintiffs afford Ford a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

115.   The amount in controversy of plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

116.   Plaintiffs, individually and on behalf of the other class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

## COUNT IV

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE § 17200, *et seq.*

117.   Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 116 as if fully set forth herein.

118.   This Count is brought on behalf of the class.

119.   "Unfair competition" is defined in California Business & Professions Code § 17200, *et seq*. as encompassing any one of the five types of business "wrongs," three of which are at issue here: (1) an "unlawful" business act or practice; (2) an "unfair"

business act or practice; and (3) a "fraudulent" business act or practice. The definitions in section 17200 are disjunctive, meaning that each of the three "wrongs" operates independently from the others.

120.   Plaintiffs and Ford are both "person[s]" as defined by California Business and Professions Code section 17201.  Section 17204 authorizes a private right of action on both an individual and representative basis.

121.   There were reasonably available alternatives to further Ford's legitimate business interests, other than the conduct described herein.

122.   Plaintiffs and the putative class reserve the right to allege other violations of law, which constitute other unlawful business practices or acts, as such conduct is ongoing and continues to this date.

## **Unfair Prong**

123.   Ford's actions and representations constitute an "unfair" business act or practice under section 17200, in that Ford's conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.  Without limitation, it is an unfair business act or practice for Ford to negligently and knowingly represent to the consuming public, including Plaintiffs, that the 2011 through 2015 model year Ford Explorers vehicles would be free from defects in design, materials and workmanship, and would be safe to operate.  Ford's business practices are unfair because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers in that consumers are led to believe that the 2011 through 2015 model year Ford Explorer vehicles are safe, effective, and free of health hazards.

124.   At a date presently unknown to Plaintiffs, but at least within the four years prior to the filing of this action, and as set forth above, Ford has committed acts of unfair competition as defined by Business and Professions Code section 17200, *et seq*.

by engaging in the false advertising and promotion of the 2011 through 2015 model year Ford Explorer vehicles as fully outlined above.

125. Plaintiffs and the putative class members could not have reasonably avoided the injury suffered by each of them. Plaintiffs reserve the right to allege further conduct that constitutes other unfair business acts or practices. Such conduct is ongoing and continues to this date.

126. Ford could have and should have furthered its legitimate business interests by expressly indicating that the 2011 through 2015 model year Ford Explorer vehicles were dangerous and defective such that drivers and passengers of those vehicles may be exposed to carbon monoxide and other dangerous gases while the vehicles are in operation.

## **Fraudulent Prong**

127. Ford's claims and misleading statements were false, misleading, and/or likely to deceive the consuming public within the meaning of section 17200. Without limitation, it is a fraudulent act or practice for Ford to knowingly or negligently represent to Plaintiffs, whether by conduct, orally, or in writing by: (1) intentionally and misleadingly advertising the safety of the 2011 through 2015 model year Ford Explorer vehicles, (2) intentionally and misleadingly minimizing the dangers caused by the 2011 through 2015 model year Ford Explorer vehicles, (3) and intentionally and misleadingly advertising the safety of the 2011 through 2015 model year Ford Explorer vehicles.

128. Plaintiffs reserve the right to allege further conduct that constitutes other fraudulent business acts or practices. Such conduct is ongoing and continues to this date.

129. The fraudulent, unlawful, and unfair business practices and false and misleading advertising of Ford, as described above, presents a continuing threat to consumers in that they will continue to be misled into purchasing/leasing the 2011 through 2015 model year Ford Explorer vehicles.

**Unlawful Prong**

130.   As otherwise herein alleged, Ford's conduct violates California law.

131.   There were reasonably available alternatives to further Ford's legitimate business interest, other than the conduct described herein.

132.   Plaintiffs and the putative class reserve the right to allege other violations of law, which constitute other unlawful business practices or acts, as such conduct is ongoing and continues to this date.

133.   As a direct and proximate result of the aforementioned acts and representations of Ford, Ford received and continues to hold monies rightfully belonging to plaintiff and other similarly situated consumers. Further, buyers and/or lessees have been and continue to be physically injured by the 2011 through 2015 model year Ford Explorer vehicles.

134.   Ford has engaged in unlawful, unfair, and fraudulent business acts or practices, entitling plaintiff to judgment and equitable relief against Ford, as set forth in the Prayer for Relief.   Pursuant to Business & Professions Code section 17203, as a result of each and every violation of the UCL, which are continuing, plaintiff and the putative class are entitled to restitution against Ford.

135.   Plaintiffs further seek an order requiring Ford to make full restitution of all moneys wrongfully obtained and disgorge all ill-gotten revenues and/or profits, together with interest thereupon.

136.   Plaintiffs further seek an order enjoining Ford from continuing to engage in the unlawful, unfair, fraudulent, untrue, and deceptive business acts and practices as described herein, consumers residing within California will continue to be exposed to and damaged by Ford's unfair competition.

137.   Plaintiffs also seek an order requiring Ford to undertake a public information campaign to inform members of the putative class of its prior acts or practices.

/ / /

# COUNT V

## VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW, BUSINESS AND PROFESSIONS CODE § 17500, *et seq.*

138.   Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 137 as if fully set forth herein.

139.   This Count is brought on behalf of the class.

140.   In violation of California Business & Professions Code § 17500, *et seq.*, Ford has disseminated or caused to be disseminated deceptive advertising misrepresentations, omissions and practices as described herein.  These statements are actionable violations of § 17500 in that Ford expressly states that the 2011 through 2015 model year Ford Explorers have attributes which they do not possess.

141.   Ford's advertising misrepresentations, omissions, and practices made in connection with the sale of the 2011 through 2015 model year Ford Explorers are unfair, deceptive and/or misleading within the meaning of California Business & Professions Code § 17500, *et seq.*  These representations are likely to, and did, deceive reasonable consumers such as plaintiff and members of the class.

142.   In making and disseminating the statements alleged herein, Ford knew or should have known that the statements were and are misleading or likely to mislead for the reasons set forth above.

143.   As detailed above, plaintiffs suffered injury in fact and a loss of money or property as a result of Ford's acts and practices, which violate § 17500, *et seq.*

144.   Pursuant to California Business & Professions Code § 17535, plaintiffs and members of the Class seek, and are entitled to:

  a. an order enjoining Ford from continuing to make false and misleading statements concerning the 2011 through 2015 model year Ford Explorers;

  b. restitution and disgorgement of any and all excessive amounts paid to Ford or its agents;

  c. equitable relief pursuant to CAL. CIV. PROC. CODE § 384;

d.  pre- and post-judgment interest at the highest rate allowable by law; and

e.  payment of attorney's fees and costs pursuant to, *inter alia*, CAL. CIV. PROC. CODE § 1021.5, the common fund and private attorney general doctrines.

145.  As a result of Ford's violations of the false advertising statute, plaintiffs and members of the class are entitled to equitable relief as the Court deems appropriate.

## COUNT VI

## VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT, CALIFORNIA CIVIL CODE §§ 1750, *et seq.*

146.  Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 145 as if fully set forth herein.

147.  This Count is brought on behalf of the class.

148.  The California Consumers Legal Remedies Act ("CLRA"), California Civil Code §1750, et seq., allows consumers who suffer damage as a result of a method, act, or practice declared to be unlawful by section 1770 to obtain relief.

149.  Plaintiffs and the Class are consumers within the meaning of the CLRA § 1761(d).  Ford's 2011 through 2015 model year Ford Explorers constitute "goods" as defined by CLRA § 1761(a).  At all times relevant hereto, Ford constituted a "person" as that term is defined in CLRA § 1761(a), and plaintiff and members of the class' purchases of 2011 through 2015 model year Ford Explorers constituted "transactions" as defined by CLRA § 1761(b).

150.  Ford violated and continues to violate the CLRA by engaging in the following deceptive practices specifically proscribed by § 1770(a), in transactions with plaintiffs and members of the class that were intended to result or which resulted in the sale or lease of goods or services to consumers:

f.  In violation of CLRA § 1770(a)(2), Ford's acts and practices constitute misrepresentations of the source, sponsorship, approval, or certification of goods or services;

g. In violation of CLRA § 1770(a)(3), Ford's acts and practices constitute misrepresentations of the affiliation, connection, or association with, or certification by another;

h. In violation of CLRA § 1770(a)(5), Ford's acts and practices constitute misrepresentations that the 2011 through 2015 model year Ford Explorers in question have characteristics, benefits, or uses which they do not have;

i. In violation of CLRA § 1770(a)(7), Ford has misrepresented that the 2011 through 2015 model year Ford Explorers in question are of a particular standard, quality and/or grade, when they are of another; and

j. In violation of CLRA § 1770(a)(9), Ford advertises the 2011 through 2015 model year Ford Explorers in question with the intent not to sell them as advertised or represented.

151.   Ford has made uniform representations that the 2011 through 2015 model year Ford Explorers are high-quality motor vehicles that will perform as represented. These representations, as set forth above, were false deceptive, and/or misleading and in violation of the CLRA.

152.   Pursuant to § 1782 of the CLRA, Ford was notified in writing by certified mail of the particular violations of Section § 1770 of the Act and asked to remedy the problems and give notice to all affected consumers of their intent to so act.  A copy of that letter is incorporated herein as Exhibit B.

153.   If Ford fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782 of the CLRA, plaintiffs will amend this complaint to add claims for actually, punitive and statutory damages and all other relief to plaintiff and members of the class under § 1780 of the CLRA.

154.   In addition, pursuant to § 1780(a)(2) of the CLRA, plaintiffs are entitled to, and therefore seeks, a Court order enjoining the above-described wrongful acts and practices that violate § 1770 of the CLRA.

155.   Plaintiffs and members of the class are also entitled to recover attorneys' fees, costs, expenses and disbursements pursuant to §1780 and § 1781 of the CLRA.

156.   Ford's conduct described herein is malicious and wanton.

157.   Pursuant to § 1780(d) of the CLRA, and to be filed in conjunction herewith, is the affidavit of the plaintiffs showing that this action has been commenced in the proper forum.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs, on their own and on behalf of the Class, respectfully requests judgment against Ford:

(a)    Certifying the class and appointing plaintiffs and their counsel to represent the class;

(b)    Ordering Ford to provide notice to the class of the defect with the design of the vehicles, and/or the exhaust and/or HVAC systems in the 2011 through 2015 model year Ford Explorers that causes carbon monoxide and exhaust to enter into the passenger compartments of such vehicles during their normal and customary use;

(c)    Ordering Ford to promptly repair and/or replace, free of charge, all subject vehicles to prevent carbon monoxide and exhaust from entering the passenger compartments of such vehicles; or ordering Ford to offer rescission to plaintiff and the members of the class by returning the full costs paid to purchase or lease the defective vehicles in exchange for the return of the defective vehicles;

(d)    Awarding damages which include, but are not limited to, the cost of any repairs and the diminution of value of the vehicles;

(e)    Awarding pre-judgment and post-judgment interest;

(f)    Awarding attorneys' fees and costs; and

(g)    Awarding any such other relief as this Court may deem just and proper.

GOMEZ
TRIAL ATTORNEYS

SECOND AMENDED CLASS ACTION COMPLAINT

# JURY DEMAND

Plaintiffs demand a trial by jury of all issues triable.


Dated: December 21, 2015

/s/   Deborah S. Dixon
John Gomez, Esq.
John P. Fiske, Esq.
Deborah S. Dixon, Esq.
**GOMEZ TRIAL ATTORNEYS**
655 West Broadway, Suite 1700
San Diego, CA  92101


**Kelley/Uustal, PLC**
John J. Uustal, Esq.
Florida Bar No. 73547
jju@kulaw.com
Jordan M. Lewis, Esq.
Florida Bar No. 97997
jml@kulaw.com
Michael A. Hersh, Esq.
Florida Bar No. 56019
mah@kulaw.com
700 S.E. 3rd Ave., Suite 3000
Fort Lauderdale, Florida 33316
Phone: (954) 522-6601
Fax: (954) 522-6608

(Motions for Pro Hac Vice Admission
Pending)

SECOND AMENDED CLASS ACTION COMPLAINT

# EXHIBIT A

John H. Gomez (SBN 171485)
John P. Fiske (SBN 249256)
Deborah S. Dixon (SBN 248965)
Stephanie S. Poli (SBN 286239)
**GOMEZ TRIAL ATTORNEYS**
655 West Broadway Suite1700
San Diego, CA 92101
Telephone:  (619) 237-3490
Fax:  (619) 237-3496
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

MICHAEL CUNNINGHAM,
individually and on behalf of all others
similarly situated,

PLAINTIFF,

v.

FORD MOTOR COMPANY, and
DOES 1 through 100, inclusive

DEFENDANT.

CASE NO. 3:15-CV-00124-L-JMA

**VENUE AFFIDAVIT OF MICHAEL
CUNNINGHAM (CIVIL CODE
SEC. 1780(D))**

I, Michael Cunningham, declare as follows:

1.    I am the named plaintiff in this action, which includes allegations for
violations of the Consumer Legal Remedies Act.

2.    In or about August of 2012, I purchased a 2013 Ford Explorer from an
authorized Ford dealership in San Diego, California.  I lived in San Diego, California at
the time of this purchase.

3.    Upon information and belief, the defendant, Ford, does business within the
City and County of San Diego.

1    4.    For these reasons, I believe San Diego is the proper venue for trial in this

2  case.

3        I declare under penalty of perjury under the laws of the State of California that the

4  forgoing is true and correct.

5

6  Dated: January _8_, 2015

7

                              Michael Cunningham

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT B**



January 20, 2015

**Sent Via Certified U.S. Mail**
Mark Fields
President and Chief Executive Officer, Ford Motor Company
William Clay Ford Jr.
Executive Chairman, Ford Motor Company
David G. Leitch,
General Counsel, Ford Motor Company
1 American Road
P.O. Box 6248
Dearborn, Michigan 48126

Dear Sirs,

This letter is sent to you on behalf of Michael Cunningham, and on behalf of all others similarly situated. At issue here is Ford's marketing and promotional practices in connection with the sale and lease of several hundreds of thousands of 2011-2015 Ford Explorer vehicles.

Plaintiffs herein allege that in marketing, leasing, and selling the 2011-2015 Ford Explorer vehicles, Ford implemented an unfair, unlawful and deceptive marketing scheme in California and elsewhere throughout the country. These practices were implemented by and through the company itself, as well as authorized Ford dealerships, and other agents who reside in and/or transact business in the State of California.

The specific factual allegations, and the basis for those allegations are outlined in the enclosed Complaint, which is hereby incorporated by this reference.

The conduct of Ford in marketing and selling the 2011-2015 Ford Explorer vehicles violates the Consumer Legal Remedies Act (California Civil Code Sec. 1750 et. seq. ("the CLRA"). Namely, Ford's marketing and sale of the 2011-2015 Ford Explorer vehicles violated the CLRA by contravening the following subsections of Civil Code Sec. 1770 (a), among others:

I.      In violation of the CLRA § 1770(a)(2), Ford's acts and practices constitute misrepresentations of the source, sponsorship, approval, or certification of goods or services;

II.     In violation of the CLRA § 1770(a)(3), Ford's acts and practices constitute misrepresentations of the affiliation, connection, or association with, or certification by another;

III.    In violation of the CLRA § 1770(a)(5), Ford's acts and practices constitute misrepresentations that the 2011 through 2015 model year Ford Explorers in question have characteristics, benefits, or uses which they do not have;

IV.     In violation of the CLRA § 1770(a)(7), Ford has misrepresented that the 2011 through 2015 model year Ford Explorers in question are of a particular standard, quality and/or grade, when they are of another;

V.    In violation of the CLRA § 1770(a)(9), Ford advertises the 2011 through 2015 model year Ford Explorers in question with the intent not to sell them as advertised or represented.

As set forth and illustrated in further detail in the enclosed Complaint, Ford's conduct also contravenes the California Unfair Competition law, as well as the California Common Law. While the Complaint herein constitutes sufficient notice under the terms of the CLRA, this letter is sent to ensure compliance with the mandates of California Civil Code Sec. 1782. Pursuant to CLRA 1782, you have thirty (30) days upon notice and demand to correct, repair, replace, or otherwise rectify the above stated violations of the CLRA.

Within thirty (30) days of this notice, Plaintiff, hereby demands that Ford rectify these violations of California law by promptly repairing and/or replacing, free of charge, all subject vehicles to prevent carbon monoxide and exhaust from entering the passenger compartments of such vehicles; or ordering Ford to offer rescission to plaintiff and the members of the class by returning the full costs paid to purchase or lease the defective vehicles in exchange for the return of the defective vehicles. Plaintiff further demands Ford recall all 2011 through 2015 model year Ford Explorer vehicles, as well as discontinue the manufacture and sale of 2015 Ford Explorer vehicles with the same dangerous defect.

Plaintiff further demands that Ford immediately cease the illegal marketing practices outlined in this Notice and the accompanying Complaint. Finally, Plaintiff demands that Ford immediately undertake a corrective advertising campaign to inform affected consumers of the off label and unlawful promotion of the 2011 through 2015 model year Ford Explorers, coupled with detailed instructive information on the means to obtain reasonable compensation.

We look forward to your prompt response.

Sincerely,

Stephanie S. Poli, Esq.
**Gomez Trial Attorneys**

**EXHIBIT C**

_____

IN RE:    BBB Auto Line Arbitration

          Consumer:  James Cassidy

          Business:  Ford Motor Company

          Case number:  FRD1430502-IR.

_____

Transcription of Audio Files of Proceedings
held January 2, 2015:


FRD1430502-1R-Cassidy- Part A and
FRD1430502-1R-Cassidy- Part B


Transcribed from audio file by:

Emily Scott, stenographic reporter

United Reporting, Inc.

1218 SE 3rd Avenue

Fort Lauderdale, Florida 33316


United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

```
                                               Page 2
 1     Thereupon, the proceedings were transcribed from CD as

 2     follows:

 3              UNIDENTIFIED SPEAKER:  -- with the New

 4         Orleans Better Business Bureau.

 5              MR. GRAY:  Yes, good morning.

 6              UNIDENTIFIED SPEAKER:  Good morning.

 7              I have Mr. and Mrs. Cassidy here, and

 8         Mr. Geoffrey Stewart, who is going to be our

 9         arbitrator this morning.

10              MR. GRAY:  Excellent.

11              UNIDENTIFIED SPEAKER:  Good.

12              Okay.  I already have the recorder

13         started, since we record all of our hearings;

14         and so what I am going to do is go ahead and

15         read the arbitrator's oath and appointment to

16         Mr. Stewart, and then I'm going to turn the

17         hearing over to him, and he'll kind of explain

18         how everything's going to work today.

19              MR. GRAY:  Okay.

20              UNIDENTIFIED SPEAKER:  Okay.

21         Mr. Stewart, you have been selected to serve

22         as an arbitrator in a dispute involving the

23         above parties, which is Mr. and Mrs. James

24         Cassidy and Ford Motor Company, represented by

25         Bob Gray.
```

United Reporting, Inc.
954.525.2221

Page 3

1           Unless you are not able to accept this

2      responsibility or feel you cannot give an

3      impartial decision in this matter, please sign

4      this arbitrator's oath.  With this form, you

5      will receive a copy of the agreement to

6      arbitrate, which outlines the dispute and

7      establishes the limits within which you must

8      make your decision.

9           To maintain the integrity of this entire

10     process, please disclose any relationship you

11     may have had with any of the parties named

12     above or with their attorneys, if any.

13     Financial, professional, commercial,

14     competitive, social or family relationships,

15     no matter how remote, should be revealed.

16          THE ARBITRATOR:  Okay.  Thank you, Lisa.

17          I'm going to read the oath.  I would say

18     that I don't have any relationship with either

19     party, except Bob Gray has been on previous --

20     he's represented Ford in other proceedings;

21     but that's the only relationship I have with

22     either party.

23          I, Geoffrey M. Stewart, hereby accept

24     appointment as arbitrator of the dispute

25     concerning the parties named above.  I swear

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 4

1          that I will act faithfully and impartially to

2          the best of my ability to hear and examine the

3          issues in dispute and to conduct the

4          proceedings and render a decision pursuant to

5          the rules of the Better Business Bureau Auto

6          Line Arbitration program and to the best of my

7          ability within the time allotted.

8               UNIDENTIFIED SPEAKER:  Okay.  Great.

9          Okay.

10              THE ARBITRATOR:  Would you like me to

11         sign the other --

12              UNIDENTIFIED SPEAKER:  No, I am just

13         going to take a copy of yours --

14              THE ARBITRATOR:  Okay.

15              UNIDENTIFIED SPEAKER:  -- later.

16         Thank you.

17              THE ARBITRATOR:  Thank you very much.

18              UNIDENTIFIED SPEAKER:  (Inaudible.)

19              MS. CASSIDY:  No.

20              MR. CASSIDY:  No.  Thank you.

21              THE ARBITRATOR:  Mr. Gray?

22              MR. GRAY:  Yes.

23              THE ARBITRATOR:  Now, as always, please

24         let me know if you can't hear at any time.

25              MR. GRAY:  Thank you.  I appreciate that.

United Reporting, Inc.
954.525.2221

```
                                              Page 5
 1        Right now it's not too bad.
 2             THE ARBITRATOR:  Is it a little low?
 3             MR. GRAY:  A little.
 4             THE ARBITRATOR:  Okay.  We are going to
 5        try to speak up.
 6             MR. GRAY:  Okay.  I appreciate that.
 7        Thank you.
 8             THE ARBITRATOR:  And the phone is pretty
 9        centrally located today, because we have a
10        longer cord.
11             So just as you heard me do, or saw me do,
12        take an oath to act impartially, I would ask
13        the parties now take an oath to give truthful
14        testimony.  If the parties in the room would
15        please raise their right hand?
16             And, Mr. Gray, I'll indicate that you are
17        swearing out by phone.
18             MR. GRAY:  Okay.
19             THE ARBITRATOR:  I swear or affirm that
20        all evidence that I give or present concerning
21        the dispute will be the truth, the whole truth
22        and nothing but the truth.  Please say "I do."
23             MR. CASSIDY:  I do.
24             MS. CASSIDY:  I do.
25             THE ARBITRATOR:  Mr. Gray?
```

Electronically signed by Emily Scott (001-198-983-7905)          97a5320e-8dd9-433c-b458-f1d3ef04156c

```
                                              Page 6
 1              MR. GRAY:  I do.

 2              THE ARBITRATOR:  Thank you.

 3              And I'm going to pass this around to the

 4         parties in the room.

 5              Mr. Gray, your title is dispute

 6         resolution specialist?

 7              MR. GRAY:  Correct.

 8              THE ARBITRATOR:  This form is asking for

 9         an address; can I get an address for you?

10              MR. GRAY:  Certainly.  It's 1320 South

11         Babcock Street, and that's Melbourne, Florida

12         32901.

13              THE ARBITRATOR:  32901, and "Babcock" is

14         B-A-B-C-O-C-K?

15              MR. GRAY:  B-A-B-C-O-C-K, yes.

16              THE ARBITRATOR:  Thank you.

17              Okay.  And I'm passing the oath to Faith

18         Cassidy and James Cassidy to sign.

19              Do you need a pen?

20              Okay.

21              MS. CASSIDY:  Would you like me to fill

22         out my address, as well?

23              THE ARBITRATOR:  Please.

24              MR. CASSIDY:  Would you do mine?

25              MS. CASSIDY:  Is it all right for me to
```

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 7

```
 1          fill out his address line?  Is that okay?
 2               THE ARBITRATOR:  Yeah, sure.
 3               MR. CASSIDY:  Her handwriting is neater
 4          than mine.
 5               THE ARBITRATOR:  It's probably neater
 6          than mine, so it's probably better -- best.
 7               Thank you very much.
 8               Welcome.  Thank you for availing yourself
 9          of the Better Business Bureau Auto Line
10          arbitration program.  This is an informal
11          dispute resolution program.
12               As Lisa mentioned, the tape recorder is
13          on.  The proceedings are being recorded.  The
14          proceedings are confidential.  I won't
15          disclose anything related to the proceedings,
16          except to Better Business Bureau staff for
17          administrative reasons.
18               The hearing format, which you may have
19          received in a packet --
20               MR. CASSIDY:  Uh-huh, yes.
21               THE ARBITRATOR:  -- I'm going to review
22          it.  I realized recently the parties probably
23          have already looked at this when I go over it,
24          so I go over it in too much detail, probably.
25               So, briefly, each party has 20 minutes to
```

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                              97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 8

1          give their basic evidence, testimony or

2          witnesses, beginning with Mr. and

3          Mrs. Cassidy.

4              It -- there follows a question, comment

5          and rebuttal period of five minutes for either

6          party.  And, at that point, I may have some

7          questions, and I'll ask them at that time.

8              I would ask that the parties, if they

9          have questions of the other party, that they

10         direct them towards me, and the other party

11         can answer to me.  The other -- the parties

12         shouldn't have conversation with each other,

13         generally speaking.  It is informal, but it

14         is -- it's not a mediation; it's an

15         arbitration.  So I'm in the position of being

16         a judge that's making a decision, and so

17         evidence is being given to me.

18             Then we go down for a vehicle inspection

19         and/or test drive, if necessary.  The purpose

20         of this is so that I can see -- in this case,

21         smell -- conditions that are complained about

22         in the agreement to arbitrate.  Because

23         Mr. Gray is participating by phone, a staff

24         member of the Better Business Bureau will come

25         down with us, also.

Electronically signed by Emily Scott (001-198-983-7905)                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 9

```
 1          Basically, we won't have any substantive
 2      conversation, nothing in the way of testimony
 3      about the condition which would -- you know,
 4      nothing like "this has been going on for six
 5      months" -- one second.
 6          That -- that -- that's not something I
 7      can perceive, you know.  I'm just there just
 8      to perceive what I can perceive.  This doesn't
 9      make or break anything.  This is just
10      additional evidence.
11          If I don't notice the condition, that
12      doesn't mean it doesn't exist; and if I do
13      notice it, it doesn't mean that a remedy is
14      available to you.
15          You had a question, Mr. Cassidy?
16          MR. CASSIDY:  Yes, sir.  Thank you.
17          During the test drive, is one of us going
18      to be with you, along with the other person,
19      or --
20          THE ARBITRATOR:  The consumers, either or
21      both of you, can come down.  One of you would
22      come down with -- with the staff member of the
23      Better Business Bureau and myself.
24          MR. CASSIDY:  Okay.
25          THE ARBITRATOR:  If Mr. Gray were here,
```

United Reporting, Inc.
954.525.2221

Page 10

1        he would also go.

2             MR. CASSIDY:  Okay.

3             THE ARBITRATOR:  After -- and if you have

4        anything that you want to indicate about the

5        experience, please wait until we get into the

6        hearing room and turn on the tape recorder and

7        get Mr. Gray back on the phone.

8             After we come back, each party has five

9        minutes for questions, comments about the test

10       drive and inspection.  I may have some

11       questions at that time.

12            Then it says we take a recess.  We

13       will -- we can do that, certainly, if either

14       party wants to, if you want to gather your

15       materials together, if you want to review

16       them, see if there is anything else you want

17       to provide me that you haven't provided

18       previously.

19            In the interest of not cutting Mr. Gray

20       off the phone a second time after another ten

21       minutes, if I don't need a recess, I'll

22       indicate that.  It's also so I can look over

23       the materials and see if there is anything I

24       want to ask.  It's -- it's also to see if

25       there is faxes, information that's being sent

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

```
 1        back and forth that everybody has, what
 2        everybody else has.
 3             So with the consent of the parties, we
 4        may waive the recess.
 5             Following that, each party has ten
 6        minutes, beginning with the consumer, as
 7        always, to give any final testimony, evidence
 8        or witnesses that they want.  That would be
 9        the place to provide things that maybe make
10        points that you felt weren't sufficiently made
11        or something you had forgotten.  I may have
12        some final questions.
13             At that point, each party has the
14        opportunity for a five-minute closing, which
15        would just be a summary of -- of the case you
16        are providing.
17             This is -- does anyone have any questions
18        about the hearing format itself?
19             MS. CASSIDY:  No, sir.
20             MR. CASSIDY:  I do not.
21             MS. CASSIDY:  No.
22             THE ARBITRATOR:  This is not a court.
23        It's an informal dispute resolution procedure.
24        There are no rules of evidence.  Hearsay is
25        admissible.  If someone said something who is
```

United Reporting, Inc.
954.525.2221

```
 1          not here, you can say "they said this."  I may

 2          not give it a lot of weight, depending, but

 3          it's admissible.

 4              There are no objections.  Anything that's

 5          relevant is -- is fine to bring up.  The only

 6          restrictions are relevance.  If it's

 7          irrelevant, then I may curb that -- or

 8          repetitious or hostile.  Those are the only

 9          restrictions.

10              There is no particular format that you

11          need to provide things or any particular

12          language.  It's just normal human language.

13              In the connection of presentation of

14          testimony, please refrain, Parties, from

15          interrupting each other and wait for your turn

16          to rebut or respond to what the other party is

17          providing, if you would please do that.

18              The hearing is focused on the agreement

19          to arbitrate, which I will now read allowed,

20          and the parties will orally confirm:  BBB Auto

21          Line agreement to arbitrate; Date, 01-02-2015;

22          Consumer, James Cassidy; Business, Ford Motor

23          Company; Case number, FRD1430502-IR;

24          Manufacturer Info, 6700LA1FM5K7F84DGC77457.

25              The decision of the arbitrator will be in
```

United Reporting, Inc.
954.525.2221

Page 13

```
 1          accordance with the BBB Auto Line arbitration

 2          rules and the applicable manufacturer's

 3          program summary.  All remedies will fall

 4          within the confines of the applicable

 5          manufacturer's program summary, unless

 6          additional remedies are noted below.

 7              Model, Explorer; Year, 2013.

 8              All parties named above submit to

 9          arbitration, the following:  Bullet point,

10          exhaust smell in cabin.

11              The parties have come to agreement on the

12          following:  NA.

13              Each party requests the arbitrator render

14          the following decision:  Consumer repairs,

15          manufacturer denial.

16              The manufacturer also agrees to extend

17          authority to the arbitrator to award the

18          following:  NA.

19              Is that your understanding, all parties,

20          of what the agreement to arbitrate says?

21              MR. GRAY:  Yes.

22              MS. CASSIDY:  Yes.

23              MR. CASSIDY:  Yes.

24              THE ARBITRATOR:  Thank you.

25              I realize in -- Mr. and Mrs. Cassidy, in
```

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

```
 1        your claim form, you mention repairs, and you

 2        also mentioned replacement.

 3              MS. CASSIDY:  Yes.

 4              THE ARBITRATOR:  So I note that, and

 5        just --

 6              MS. CASSIDY:  Thank you.

 7              THE ARBITRATOR:  -- because it says

 8        "repairs" here, doesn't mean that I couldn't

 9        order replacement, if -- if such remedy were

10        available.

11              MS. CASSIDY:  Yes, sir.

12              THE ARBITRATOR:  The decision is

13        conditionally binding, which you may or may

14        not know means it's binding on the

15        manufacturer, not on the consumer.  So if you

16        don't like the decision, you are free to

17        pursue any other legal remedies you may have.

18              MS. CASSIDY:  Okay.

19              THE ARBITRATOR:  You are free to reject

20        the decision.

21              MS. CASSIDY:  Yes, sir.

22              THE ARBITRATOR:  I won't divulge a

23        decision today.  I also won't indicate, you

24        know, where I'm going with it.  I am not going

25        to -- for instance, when we go down for the
```

United Reporting, Inc.
954.525.2221

Page 15

1      test drive, I'm not going to give an

2      indication of what I'm perceiving.  I'm just

3      gathering evidence, and I'll provide a written

4      decision within three business days, which

5      would be -- not including today, would be the

6      close of business Friday.

7          That gets sent to the main council of the

8      Better Business Bureau.  They review it, and

9      then they forward it to the parties, if

10     accepted.

11         MS. CASSIDY:  Okay.

12         THE ARBITRATOR:  So by next week.

13         MS. CASSIDY:  Okay.

14         THE ARBITRATOR:  The only thing that

15     would -- that would change that is if -- well,

16     if I ordered a technical expert to look at it

17     or something like that, obviously, that would

18     take more time; but you would also know that,

19     because you'd be notified and so on.

20         Does anybody have any questions about any

21     of these preliminary matters?

22         MS. CASSIDY:  No.

23         MR. CASSIDY:  No.

24         MR. GRAY:  No.

25         THE ARBITRATOR:  Okay.

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                                      97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 16

```
 1            And, Mr. Gray, are you hearing me okay?
 2       I realize I'm going higher and lower in my
 3       volume.
 4            MR. GRAY:  No, you're doing fine.  Thank
 5       you.
 6            THE ARBITRATOR:  All right.  Thank you.
 7            Well, Miss -- Ms. Cassidy, I believe you
 8       want to present --
 9            MS. CASSIDY:  Yes.
10            THE ARBITRATOR:  -- so you have 20
11       minutes.
12            MS. CASSIDY:  Yes, sir.
13            My husband and I purchased this vehicle
14       at the end of May 2013.  Shortly after
15       purchasing the vehicle, within a week or so,
16       we took the vehicle on a long trip to Florida.
17       We did notice some exhaust smell in the
18       vehicle but really kind of attributed it to,
19       you know, not having the air circulate on.  It
20       was coming in from outside, as you would in a
21       normal vehicle, it would come -- you would
22       think it would come and go.  But we continued
23       to notice that it was happening after coming
24       home.
25            I do a lot of interstate driving from --
```

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 17

1          from my home to my employment, and so there is

2          a lot of acceleration on and off the

3          interstate or passing on the interstate; and

4          so I noticed, with acceleration, there would

5          be this smell in the cabin.

6               One particular day I was coming home, and

7          I had to merge to get into a single line to

8          get towards house.  I heavily accelerated.

9          The cabin was so full of exhaust smell, I

10         immediately became lightheaded and nauseated.

11         I had to put all four windows in the vehicle

12         down to relieve it, and that's when I

13         decided -- we decided, something's wrong, and

14         it was --

15              THE ARBITRATOR:  This was -- this was

16         when?

17              MS. CASSIDY:  In July, at the beginning

18         of July.

19              I called the dealership, and we did bring

20         the vehicle in on July the 13th for the first

21         complaint with the exhaust smell.  At that

22         time, Bohn Ford said they had not heard of

23         anything, you know, that this was basically

24         new to them.

25              So they kept the vehicle from July the

Electronically signed by Emily Scott (001-198-983-7905)                              97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 18

1          3rd to July the 9th and did some -- whatever

2          they did trying to figure out what the problem

3          was and gave the vehicle back.  In --

4               THE ARBITRATOR:  Was it July 13th or July

5          3rd?

6               MS. CASSIDY:  July 13th, I'm sorry.

7               THE ARBITRATOR:  Thank you.

8               MS. CASSIDY:  Yes.

9               It was very soon noticed, when we got the

10         vehicle back, that it was not corrected.  So

11         they kept it from the 13th to the 19th of

12         July.  We returned it back on the 23rd of

13         July, telling them it's not right.  So then

14         they kept it from July 23rd to August the 8th

15         and, again, with no successful resolution.

16              It was brought up to the field engineer,

17         I believe, Ken Campbell, the local area field

18         service engineer, to look into the issue; and

19         I believe at that time, or somewhere around

20         that time, it was brought to Ford

21         Corporation's attention that there was an

22         issue with this exhaust in the vehicle.

23              Basically, we were told that there was no

24         fix for it.  They were looking into it to try

25         to figure out what the problem was and how

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

1        they were going to be able to fix it.

2            We periodically checked in to see what

3        the fix was, if there was -- was there a fix,

4        because we were never -- no one ever called us

5        back to say, "hey, we have a fix" or "we are

6        work -- "we are still working on a fix"; and

7        we were kept being put off, saying, you know,

8        "we're working on it, we're working on it."

9            So, basically, every time I brought my

10       car in for an oil change and tire rotation,

11       which we do per the manufacturer's

12       recommendation, we were asking about it; and

13       sometimes, in between, I would ask.

14           In the meantime, as I'm driving to and

15       from work every day, I'm having to crack all

16       four of my windows to keep this smell out of

17       my car because I'm developing headaches.  I

18       drive about 18 miles to work every day, so I'm

19       developing headaches; and I'm noticing when

20       I'm getting out of the vehicle, within 15 or

21       20 minutes, I feel better.  It's like it's

22       gone.  So I'm like just, am I nuts, you know?

23           But, anyway, we kept checking; and then,

24       finally, they tell us this summer that there's

25       going to be a fix around August or September.

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 20

```
 1        So I checked with Banner Ford on my side of
 2        the lake, and we brought the vehicle in in
 3        September; and they said -- I said, is this
 4        the fix?  Because we've had two attempts now,
 5        is this --
 6             Oh, yes, ma'am, this is the fix.
 7             So I drove off the lot.  I accelerate to
 8        get onto the interstate to get back to my
 9        residence, and lo and behold, the smell is
10        still in my car.
11             THE ARBITRATOR:  Following that --
12             MS. CASSIDY:  Following that attempted
13        fix.
14             I called back -- I said, well, let me
15        give it a couple of days, maybe I'm just, you
16        know, hearing and seeing and smelling things
17        that are not there, so --
18             THE ARBITRATOR:  And this is -- this is
19        September a year later; is that correct?
20             MS. CASSIDY:  This -- that is correct,
21        yes, sir.
22             THE ARBITRATOR:  All right.
23             MS. CASSIDY:  This whole time, I've
24        been -- we've been faithfully waiting for a
25        fix for the vehicle.
```

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 21

1          So when I call back to tell them, "hey,
2     this didn't work," I was told, "oh, the fix is
3     coming in December."  And I said, "wait a
4     minute, you just told me this was the fix."
5          So I became very frustrated at that
6     point.
7          I filed a claim myself with Ford Motor
8     Company on September the 16th, and I was given
9     a case number.  I was told at that time that I
10    would get a call from someone managing my
11    complaint.
12         I did receive a phone call, which I
13    missed -- I was in a meeting -- from a
14    gentleman named Leon at Ford Motor Credit on
15    the 16th telling me that Ann was assigned to
16    my case and that Ann would be in touch with
17    me, she was out on vacation.  And he gave me a
18    date that she would be back, which would have
19    been the 22nd of March.
20         THE ARBITRATOR:  Okay.
21         MS. CASSIDY:  I didn't hear from her.  So
22    on the 23rd -- and I called and I spoke with a
23    lady named Debby.  At this point, I have yet
24    to hear from Ann ever.  Ann has never called
25    me to discuss my issue or concern.

United Reporting, Inc.
954.525.2221

Page 22

```
 1          I became extremely frustrated waiting for
 2      someone to call me, so I called again in
 3      October; and I said, what -- what are my
 4      options at that point, because my vehicle is
 5      still horrible and --
 6          Oh, let me back up and tell you this:
 7      When I brought the vehicle in in September for
 8      the supposed fix, the service advisor, Jim
 9      Gregorio, at Banner Ford, opened the door to
10      my vehicle and said, oh, my God, this is
11      terrible.
12          I said, yes, this is what I'm living with
13      every day since May 28th of 2013 is what's
14      going on in my vehicle.
15          So, anyway, I -- I was advised that my
16      only option at this point was to go through
17      the Better Business Bureau to file a formal
18      complaint, which I did, I think around the
19      24th.
20          THE ARBITRATOR:  Of October?
21          MS. CASSIDY:  Of October, October 24th,
22      yes, sir.
23          The Better Business Bureau, I guess, took
24      my information and forwarded it to Ford.
25      Ford's response was, they were going to have
```

United Reporting, Inc.
954.525.2221

Page 23

```
 1          the field service engineer look at -- they
 2          wanted to look at the vehicle in December.
 3          They felt like the field service engineer
 4          could fix the vehicle in December.
 5              And I said, okay, perfect.
 6              Well, I get a call from Kelly at Ford
 7          and -- I'm sorry, I mean, excuse me, Cheryl --
 8          Cherie, Cherie, S -- C-H-E-R-I-E, at Ford, and
 9          I didn't get the date; I didn't write the date
10          down, saying that --
11              THE ARBITRATOR:  Roughly when was it?
12              MS. CASSIDY:  It was in early December.
13              -- saying that the fix wasn't -- was
14          going to be coming January the 15th and would
15          I accept that.
16              And I said, well, wait a minute.  First
17          off, I agreed to allow the engineer to look at
18          it, because you guys said you were going to
19          fix it, but that letter was dated December the
20          2nd by the Better Business Bureau.
21              I said, January 15th is out of the 30
22          days that you guys are allowed.
23              I said, you know, forgive me for being a
24          little skeptical, but I keep being told that
25          the fix is coming, and here we are a year and
```

Electronically signed by Emily Scott (001-198-983-7905)                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 24

1          a half later, and I'm waiting.

2               So I said, I'm not going to agree to

3          anything.  We're going to go ahead and go to

4          arbitration.

5               So starting January the 15th, last week,

6          my husband and I have called every day to

7          Ford, with the exception of Saturday, because

8          it's not a real, true business day for Ford

9          Motor Corporation to send the fix, and Sunday;

10         and as of 9 o'clock this morning, there was no

11         fix for my vehicle.  I called on the way here

12         to verify that.

13              Now, I want to say, Mr. Stewart, and to

14         the gentleman that's on the phone, my husband

15         and I are Ford owners.  We have three other

16         Ford vehicles; and that may or may not be

17         relevant, but we don't have problems with our

18         other Fords, and we are not complainers and

19         malcontents.

20              This is an issue and a concern that we

21         have been very faithful and patient and

22         waiting because, frankly, the vehicle, aside

23         from this issue, is a lovely vehicle.  That's

24         why we bought it, but this is just

25         unacceptable.

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

```
 1           I have a grandchild coming in July.  Do I
 2      want to put a grandchild in the back,
 3      breathing potentially poisonous information --
 4      I mean emissions?
 5           In our research -- because Ford kept
 6      telling us that -- you know, basically, we
 7      felt like, well, we're the only ones with this
 8      issue?  We decided to start looking into this.
 9           There is information here that says this
10      has been sent to the NHTSA for potentially
11      lethal carbon monoxide emissions building up
12      inside 2011 through 2014 Explorers.  This is
13      not right.
14           THE ARBITRATOR:  And what -- what is this
15      document?
16           MS. CASSIDY:  I -- we printed it off the
17      internet.  We just started, like I said, just
18      searching around --
19           MR. CASSIDY:  The -- may I interject --
20           THE ARBITRATOR:  Please.
21           MR. CASSIDY:  -- now because I said I
22      wasn't but, you know --
23           THE ARBITRATOR:  No, please.
24           MR. CASSIDY:  -- I guess I can't help
25      myself.
```

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

1          Because we started looking to see, you

2      know, what else was out there, we came

3      across -- there is a class action lawsuit out

4      of Florida regarding the same situation.  I

5      didn't write any of that information down,

6      because I do not believe it's pertinent, you

7      know, right now, because we're going through

8      this informal hearing.

9          In those searches on the internet,

10     like -- like she showed you, you know, we

11     found this here.

12         We also found the original two TSBs that

13     Ford issued regarding the exhaust smell in --

14     regarding the Explorer, and we actually

15     printed those copies off and brought them to

16     Ford and said, hey, you know, this is an

17     issue.  So they do -- they did have copies of

18     those TSBs.

19         One of the dealerships, I think it was

20     Banner, was unfamiliar with the TSB on the --

21     on the vehicle, but there are two of them out

22     there.  One supersedes the other one, though,

23     so...

24         THE ARBITRATOR:  Let me stop you for one

25     moment.  I -- I have a copy of a TSB.

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                              97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 27

```
 1          MS. CASSIDY:  It is -- it may be this one
 2      here, this 581.
 3          THE ARBITRATOR:  I believe that's it.
 4          MR. CASSIDY:  I never could find --
 5          MS. CASSIDY:  That's it.
 6          MR. CASSIDY:  I never could find the
 7      original one.  I had it, and I gave it to one
 8      of the Ford employees at Bohn; and I guess I
 9      shouldn't have done that.  I should have made
10      a copy, but I can't find that original TSB.
11          THE ARBITRATOR:  Mr. Cassidy, so you are
12      saying there is a TSB that this supersedes?
13          MR. CASSIDY:  Yes, sir.
14          THE ARBITRATOR:  Okay.
15          MS. CASSIDY:  There is one -- and it
16      tells you here, this one supersedes this one.
17          THE ARBITRATOR:  Okay.
18          MR. CASSIDY:  I had that copy, but --
19          MS. CASSIDY:  So --
20          MR. CASSIDY:  -- I gave it to someone at
21      Bohn.  Sorry.
22          MS. CASSIDY:  -- I think that Ford keeps
23      telling us that, "well, we've only had it
24      three times to fix it; you are not allowing us
25      to fix it."
```

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 28

```
 1            Well, if this has been going on since the
 2       2011 Explorers, they've had plenty of ample
 3       opportunity, in my personal opinion, to fix
 4       it; and we've been patient, and -- and -- and
 5       just trying to, you know, let them fix it, but
 6       they are not fixing it.  Even to this day,
 7       here we go, another date that we're going to
 8       have a fix and it is not available.
 9            And every day that I drive this vehicle,
10       I -- every Monday through Friday I have to
11       drive, if the weather permits, with my windows
12       down, which is -- you know.
13            And, oh, this last fix -- this may be
14       irrelevant, but I would like to let you
15       know --
16            THE ARBITRATOR:  Sure.
17            MS. CASSIDY:  -- the last fix that they
18       did to the vehicle, my gas mileage now has
19       gone down in the vehicle about four to five
20       miles per gallon, and, again, it's the same
21       driving conditions.  So I thought maybe it was
22       the tank of gas, but, no, it's continuing.  So
23       I don't know, are they going to continue
24       whatever they do cause this issue to make it
25       worse?
```

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                                              97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 29

```
 1          THE ARBITRATOR:  You are saying since the
 2     September --
 3          MS. CASSIDY:  September fix, that's
 4     correct.
 5          THE ARBITRATOR:  Okay.
 6          MS. CASSIDY:  I'm not sure if there is
 7     anything else that I can add to how -- just
 8     other than I am just disappointed, you know,
 9     as being, you know, a four-car owner, that
10     this is how things are come -- to have come to
11     this.
12          Jim?
13          Oh, I can't get -- I have two -- a
14     19-year-old and a 20-year-old still, not at
15     home; they are at college.  They are four
16     hours away at college.
17          THE ARBITRATOR:  Uh-huh.
18          MS. CASSIDY:  They will not -- if we
19     drive in this vehicle, even with those windows
20     cracked all the way up four hours away --
21          THE ARBITRATOR:  Uh-huh.
22          MS. CASSIDY:  -- they don't want to get
23     in the vehicle because you can smell it.  I
24     mean, you may, when you go to drive it, be
25     able to smell it when you open the doors.
```

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 30

```
 1          THE ARBITRATOR:  Your children, 19 and
 2      20 --
 3          MS. CASSIDY:  Yep, do not want to drive
 4      in the -- ride in the back of the vehicle.  We
 5      have to turn off -- first off --
 6          MR. CASSIDY:  There you go.
 7          MS. CASSIDY:  -- you have to turn off the
 8      air, the back air --
 9          MR. CASSIDY:  Yep.
10          MS. CASSIDY:  -- and it still does not --
11      Ford, I think, is of the opinion that that's
12      the only place that it's coming from; but even
13      when you turn that back air off, which is the
14      point of me owning -- buying the vehicle and
15      paying for back air, you know, if I can't use
16      it --
17          MR. CASSIDY:  Can't use it.
18          MS. CASSIDY:  -- but it's still in there.
19          THE ARBITRATOR:  Okay.  Is there anything
20      else?
21          MS. CASSIDY:  Did you have anything else,
22      honey?
23          MR. CASSIDY:  I think you covered it all.
24      We can review it at the end, the five
25      minutes --
```

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 31

```
 1            MS. CASSIDY:  Right.  Okay.

 2            MR. CASSIDY:  -- (inaudible.)

 3            THE ARBITRATOR:  Right.  You'll have

 4        ample opportunity if there's --

 5            MR. CASSIDY:  Did you need copies of

 6        these things?  Because we made copies of these

 7        for you, this here and that other.

 8            MS. CASSIDY:  I think he has all of the

 9        stuff from the -- the -- all the times that we

10        brought the car in.  It looks like they sent

11        him everything, forward.

12            I can give -- you can have this, if

13        you're interested in that.

14            THE ARBITRATOR:  I'll -- Mr. Gray,

15        Mrs. Cassidy is showing me a --

16            MS. CASSIDY:  What is that?

17            MR. CASSIDY:  TSB.

18            THE ARBITRATOR:  -- NHTSA -- some

19        information about 2011 to 2014 Ford Explorers

20        and carbon monoxide dangers.  That's what I'm

21        looking at.

22            MR. GRAY:  Okay.  Um, yeah, I would like

23        a copy of that, actually, if it's possible.

24            THE ARBITRATOR:  Okay.  We're going to --

25        would you like me to get the copy to you now?
```

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 32

```
 1          MR. GRAY:  It can wait until the test
 2      drive.
 3          THE ARBITRATOR:  Okay.  Then I'll have
 4      Lisa send it over.
 5          What would be a good fax number?
 6          MR. GRAY:  Sure.  866 --
 7          THE ARBITRATOR:  866.
 8          MR. GRAY:  -- 433 --
 9          THE ARBITRATOR:  433.
10          MR. GRAY:  -- 7972.
11          THE ARBITRATOR:  7972?
12          MR. GRAY:  Yes.
13          THE ARBITRATOR:  And it would go directly
14      to you?
15          MR. GRAY:  It will -- it will come
16      directly to my computer.
17          THE ARBITRATOR:  Okay.  Great.
18          MR. CASSIDY:  And let me point out,
19      Mr. Stewart, these are just, you know,
20      searches that we found; and like I said, you
21      know, we only printed off two items or three
22      items, you know, that we thought were
23      pertinent.
24          There -- but if you go on the internet,
25      there's a lot more where they talk about, you
```

United Reporting, Inc.
954.525.2221

Page 33

```
 1        know, the potential hazards of the carbon

 2        monoxide in the cabin.

 3             THE ARBITRATOR:  I appreciate that.

 4             MR. CASSIDY:  I mean, we could --

 5             THE ARBITRATOR:  To the extent it has

 6        relevance, you know, I'll consider it.

 7        Broad-based -- I mean, the issue in this case

 8        is -- it has some relevance.  It doesn't have

 9        a lot of relevance, because the issue in this

10        case is whether this vehicle is suffering from

11        a vehicle defect and whether various criteria

12        has been established, not whether, broadly,

13        there is problems with a vehicle or not.  But

14        I appreciate that, and Mr. Gray wants a copy,

15        and we're -- I am -- I am certainly going to

16        review it.

17             That said, is there anything else at this

18        time?

19             MS. CASSIDY:  Well, I think the only

20        thing that I would like to add is, I've often

21        thought to myself when -- as I'm getting out

22        and it's made me feel the way it makes me feel

23        riding in my vehicle, that I'm making these

24        payments faithfully, on, every month, and I

25        have to go to work so that I can make my
```

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 34

1          payments, is that, you know, people inhale

2          this type of stuff to kill themselves, and

3          what am I -- what's happening to me when I'm

4          getting a low dose of this twice a day five

5          days a week?  It's very concerning to me.

6               It seems that Ford, you know, knowing

7          about this as long as they've known about it,

8          doesn't seem to be in any hurry to fix it, and

9          it's just -- it's troubling.

10              MR. CASSIDY:  Has not made this public,

11         either.

12              THE ARBITRATOR:  Okay.  Thank you.

13              MS. CASSIDY:  Thank you.

14              THE ARBITRATOR:  Mr. Gray?

15              MR. GRAY:  Yes.  Well, first of all --

16              THE ARBITRATOR:  (Inaudible).

17              MR. GRAY:  -- I want to thank everybody

18         for being here today.  The BBB is a great

19         program, saves people a lot of money on

20         lawyers and things like that; but if we don't

21         have, you know, good customers that are

22         willing to take part in it, it doesn't do

23         anybody any good.  And if we don't have

24         arbitrators willing to come and -- and give

25         their time, it doesn't do anybody any good.

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 35

1      So -- so thank you, first of all, for -- as I

2      said, just for being here and taking part in

3      the program.

4           THE ARBITRATOR:  Well, thank you for

5      participating, also.

6           MR. GRAY:  My -- my job for Ford -- I

7      always get into this, because everybody seems

8      to have different expectations of what it is

9      that I do.  My job for Ford is relatively

10     simple, on the surface, anyway.  It's to look

11     at the guidelines of the state.  In some

12     states we do what's called a concurrent

13     program with the -- with the state's lemon

14     law.  We don't do that in -- in -- in your

15     state.  We -- we run off of the guidelines

16     that are set forth by the BBB Auto Line

17     program under the summary guidelines.

18          So my job is to look at that, look at the

19     information that I can gather from the

20     dealerships, what the customer (inaudible),

21     things like that, and -- and see if -- where

22     we stand.

23          Sometimes that's difficult because the

24     dealerships are all independently owned and

25     operated, separate and distinct from Ford by

United Reporting, Inc.
954.525.2221

Page 36

1     law.  They are their own businesses.  So, for

2     a lot of the information, we have to request

3     it from the dealerships, so sometimes that

4     takes time; and sometimes, when I am -- you

5     know, we still have -- have issues with it.

6          But, basically, my job is to look at all

7     the information that I can gather and -- and

8     see if it meets the guidelines for repurchase

9     or replacement or repairs, whichever the

10    customer is -- whatever the customer is

11    seeking.

12         So, in this case, the difficult part of

13    my job -- I said that my job was fairly

14    simple; the difficult part of it is taking the

15    emotions out of it, because I do feel for, you

16    know, people that are upset at their vehicles,

17    upset with Ford.

18         And Ford is so monolithic in so many

19    different ways, but it's also got a bunch of

20    little nooks and crannies and different

21    departments, and every -- you know, one hand

22    often doesn't know what the other hand is

23    doing.  So I try to make sure that I get as

24    much of that information as I can.

25         In this case, essentially what I've been

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                                              97a5320e-8dd9-433c-b458-f1d3ef04156c

1          told about this issue is -- is that under hard

2          acceleration, with the air-conditioning set on

3          recirculate, that an exhaust smell can enter

4          the -- enter the cabin of the vehicle.

5               Now, there is -- there is several things

6          with that.  First of all, there -- there needs

7          to be a determination made.  The guidelines do

8          state on the last page -- I don't know if you

9          have a copy right there in front of you or

10         not --

11              THE ARBITRATOR:  The program summary?

12              MR. GRAY:  -- the (inaudible) are not

13         eligible is -- is listed.  If the customer is

14         saying that it's causing physical issues with

15         them, then that becomes a product liability

16         case, rather than a case for the BBB Auto

17         Line.

18              In this case, we do have a customer --

19         the customer is saying that they feel that

20         this is making them ill.  They're worried

21         about the effects on their grandchild, worried

22         about the effects on them.

23              So when we read that guideline -- and I'm

24         trying to get to it here on my computer --

25         essentially, what it says:  Claims involving a

Electronically signed by Emily Scott (001-198-983-7905)                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 38

1          vehicle defect, if the customer alleges,

2          either as a part of the BBB Auto Line claim,

3          or at any other time, that the vehicle defect

4          has caused, one, bodily injury or, two, caused

5          an accident or fire that resulted in damage to

6          any vehicle or damage to property -- well,

7          there hasn't been an accident.  So the

8          question is, is it causing bodily injury?

9               If, Arbitrator, if you feel that that's

10         the case, then the BBB case would be

11         ineligible.

12              I just want to make sure that this goes

13         through the proper venue, especially if it is

14         making people sick.  When I start hearing talk

15         about, you know, carbon monoxide poisoning and

16         things of that sort, it is -- it is worrisome,

17         obviously not something Ford wants to have

18         happen, so there is that.

19              Then there is the issue of -- when you

20         look at the guidelines, there is -- there is

21         three bulleted points that need to be met in

22         some way for a repurchase or replacement to be

23         granted.

24              So going through those, the first thing,

25         the issue has to be reported within 18 months

Electronically signed by Emily Scott (001-198-983-7905)                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

```
 1        or 18,000 miles, whichever comes first.  I
 2        don't believe that's an issue.  The issue we
 3        first had reported was at 4,784 miles, so I
 4        don't -- I believe that one's been met, but
 5        all three of them need to be in some way.
 6            The second one is, is that the issue has
 7        to be subject to repair four or more times and
 8        continue to exist or 30 days out of service.
 9        Ford doesn't see that being met on either --
10        either one of those prongs, either the number
11        of repair attempts -- we have three -- or the
12        days out of service.  I believe I figured it
13        to be about 18 or 19.  So we don't feel it
14        meets on that level.
15            And then the third bulleted point is --
16        is the one that's always difficult because it
17        means -- it shows that there has to be a
18        substantial impairment to the safety, value or
19        use of the vehicle.  Well, with something
20        that's occurring only when you are hard on the
21        accelerator and only when the air-conditioning
22        is set on recirculate, Ford would say there is
23        other ways to set your air conditioner so it
24        doesn't happen; and then, at the times when
25        you really, truly do need to accelerate
```

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 40

1        heavily are not the majority part of your

2        driving.  So we would question whether or not

3        this is a substantial impairment to the

4        safety, value or use of the vehicle.

5             I'm always mindful when -- when I say

6        that, that when the guidelines came into

7        place, when most of the lemon laws came into

8        place, was when we were having issues with

9        vehicles simply not operating or not being

10       able to operate safely.  We don't feel that's

11       the case here.  We don't feel that this rises

12       to that level, where the vehicle would need to

13       be repurchased.

14            In terms of repairs, I wish I had more

15       information on -- on the repair.  I've checked

16       with our -- our technical experts.  They do

17       say now they are figuring now the middle of

18       January, so about now; but it -- I believe it

19       was Mrs. Cassidy said it's still not out yet.

20            Now, the reason for that is, is that we

21       have done two technical service bulletins on

22       this, which are essentially updates to the

23       service manual for the vehicle, trying to

24       address it in different ways.

25            We do feel that it's a design issue.

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 41

1          It's simply a vent leading somewhere where it

2          doesn't need to be; and, you know, it's just

3          being set in a certain way that's -- that's

4          allowing it to draw it into the -- into the

5          vehicle.

6              With two technical service bulletins out,

7          they are going to be very careful before they

8          come out with a third one, you know.  We are

9          pretty confident when we come out with these

10         that they've been tested, they seem to work;

11         but sometimes, when you put them out in

12         real-world situations, it's not the same.  So

13         we do feel that it's a design issue, not a

14         defect.  The fact that it's being reported

15         across the large number of vehicles would show

16         that it's not a defect in this particular

17         vehicle -- excuse me -- and so we have to

18         question that.

19             Essentially, when you add that all up, a

20         lot of it is going to come down to the test

21         drive.  Now, I've never -- never seen the

22         Cassidys' vehicle.  I've never driven in it.

23         I'm trying to remember the last time,

24         honestly, that I was ever even in an Explorer

25         on a -- on a personal level.  I know it's been

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 42

 1          a while, anyway, so I wouldn't be the one to
 2          judge anyway.
 3               In my position, as I said, I am pretty
 4          removed from -- from the situation at hand.  I
 5          understand the customer's frustration, because
 6          I am a customer myself; but in terms of what's
 7          actually going on with the vehicle, how --
 8          how -- at what level this is, I guess is
 9          something that I can't accurately say -- you
10          know, I can look to the ROs and say what they
11          say, but in regards to -- to how substantial
12          an impact this is, you know, it's difficult,
13          because people have different -- excuse me,
14          I'm stuttering.
15               THE ARBITRATOR:  That's okay.
16               MR. GRAY:  People have different
17          sensitivities.  So what may be very extreme to
18          one person may not bother the average person.
19          On the other hand, me, you know, I definitely
20          wouldn't want to go test this myself, because
21          I have a lousy sense of smell, so it probably
22          wouldn't bother me in the least, but that's
23          me.  And I'm not there to -- you know, to --
24          to ride in the vehicle, so I'm grateful for
25          the opportunity for the arbitrator to be able

Electronically signed by Emily Scott (001-198-983-7905)                                                                97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 43

1          to go and look this over themselves.

2               I really feel that this case comes down

3          to -- to several different things.  In terms

4          of Ford's request for a denial of -- of,

5          essentially, a repurchase, we are willing to

6          repair this as soon as we can, as soon as we

7          have the fix for it; but in terms of

8          repurchase or replacement, we don't feel that

9          it's a substantial impairment.  That may --

10         that may be -- not be your experience.  It may

11         be your experience as you go out for the test

12         drive.

13              In terms of the guidelines, we only have

14         two, possibly three, repairs and, as I said,

15         about 19 days out of service, so we don't feel

16         that it meets that criteria; and all of them

17         need to be met for repurchase or replacement

18         to be granted.

19              In -- in this case, in terms of repairs,

20         as I said, we are looking to have that repair

21         available, but we want to have it in place

22         before we call the customer and say, "yeah,

23         come on in and have this done," because we

24         don't want to frustrate them further.

25              So we don't feel it meets the guidelines

United Reporting, Inc.
954.525.2221

Page 44

1       on those last two bulleted points, either the

2       number of repairs, the days out of service or

3       being a substantial impairment to safety,

4       value or use of the vehicle; and those are the

5       reasons we are seeking a denial.

6           THE ARBITRATOR:  Okay.  Thank you very

7       much.

8           Do you have anything else at this time,

9       Mr. Gray?

10          MR. GRAY:  No, I don't.

11          THE ARBITRATOR:  Mr. and Mrs. Cassidy,

12      you have five minutes for questions or

13      rebuttals.

14          MS. CASSIDY:  Well, the first thing I'd

15      like to say is, they -- they keep -- again, as

16      he reiterated, they want -- they want to fix

17      the vehicle.  We want them to fix the vehicle,

18      but how long do I have to wait under these

19      conditions for them to fix the vehicle?  I

20      mean, I could have called Ford every single

21      day, I could have brought the car in every

22      single day to ask them to fix it, and then I

23      could have had 700 attempts to fix it; but if

24      I know they don't have a fix, why -- you see

25      what I'm saying?

United Reporting, Inc.
954.525.2221

Page 45

```
 1        It's like he is arguing the point that,
 2     "well, we haven't had four attempts to fix
 3     it."  Well, you could have had over 700
 4     attempts to fix it, and you would not be able
 5     to fix it because you do not have the fix,
 6     so -- and he is right; he is not living this
 7     every day.  He is not here to smell it every
 8     day.
 9          MR. CASSIDY:  And let me interject
10     this --
11          THE ARBITRATOR:  Okay.
12          MR. CASSIDY:  -- you know, he brings up a
13     point that -- you know, that this TSB has been
14     out -- how long has this TSB been out?  He is
15     asking, you know, for us to give them time to
16     come up with the repair, but how long have
17     they known about it?  So are we going to wait
18     another two years, another three years?  I
19     mean, eventually, the value of the vehicle is
20     going to be, you know, rock bottom.
21          So, I mean, yes, we would like to have
22     them fix the vehicle, but how long do we have
23     to wait?
24          The TSBN -- the TSBN, like I said, has
25     been out for awhile.  They've been looking at
```

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 46

```
1          trying to repair this.  It's a design issue.
2          How long do we have to wait for them to -- you
3          know, to come up with a fix?  They've already
4          had time.  They've had plenty of time, and
5          they still haven't fixed it.
6               THE ARBITRATOR:  Okay.
7               MR. CASSIDY:  And then he also brings up
8          a point about -- you know, about not driving
9          the car under the conditions, you know, like
10         don't have the recirculator on, don't
11         accelerate, don't pass.  Why would you buy a
12         vehicle if you can't use the full potential of
13         that vehicle?  That doesn't make sense.
14         That's like saying:  "Okay, well, it comes
15         with four wheels, but we are going to take off
16         one of them because we don't want that one to
17         wear out."  That -- it doesn't make sense.
18         That's an irrelevant point.
19              You make a car -- you make a car with --
20         you know, that has a potential; and it's the
21         consumer, you know, who decides on how he is
22         going to use that vehicle.  You know, we want
23         to drive the vehicle the way we drive it, you
24         know, using the back air conditioner, you
25         know, and then, when need be, you know, to
```

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 47

```
 1          pass a vehicle, to accelerate.  Well, you are
 2          telling me I can't accelerate the vehicle.
 3              THE ARBITRATOR:  Okay.
 4              MS. CASSIDY:  It's just -- that doesn't
 5          make -- that argument, in my opinion, makes no
 6          sense.  I mean, it's the normal use of the
 7          vehicle to be able to accelerate and to use
 8          the air in the back.
 9              THE ARBITRATOR:  Okay.  Anything else?
10              MS. CASSIDY:  No, sir, I'm good.
11              MR. GRAY:  Just let me respond.
12              THE ARBITRATOR:  Sure.
13              MR. GRAY:  Essentially, as -- as I said,
14          there is -- I understand your position, and I
15          understand your being upset with the vehicle.
16          I'm glad that your previous Ford vehicles
17          were, you know, relatively trouble free.
18              But in terms of -- of why I'm making
19          these arguments, I'm making these arguments
20          because we do have the guidelines before us.
21          I -- I didn't make those.  Ford didn't come up
22          with those all on their own.  They are the
23          guidelines we are working with.
24              So, essentially, the guidelines do say we
25          have to have a certain number of repair
```

Electronically signed by Emily Scott (001-198-983-7905)                              97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 48

1          attempts.  Now, could you have brought the

2          vehicle in that number of times?  Yes, you

3          could have.  I admit it's a perfectly arguable

4          point; but we don't have the number of -- of

5          days out of service.  We don't have the number

6          of repair attempts.  That's the guidelines.  I

7          understand your point.

8               The other point really comes down to, is

9          this a substantial enough impairment to the

10         safety, value or use of the vehicle to warrant

11         repurchasing the whole vehicle?  As I said,

12         Ford is -- is attempting to come up with a

13         fix.  I understand your frustration on the

14         timeline.  I know it's frustrating for -- for

15         people at Ford, as well, not on the same

16         level, because we are not driving the vehicle

17         every day.

18              But in terms of repurchase or

19         replacement, the question really comes down,

20         is this a substantial enough impairment in

21         itself to warrant the replacement or

22         repurchase of the vehicle?  That's something,

23         as I've been very forthright about saying, you

24         know, it's going to depend on the test drive;

25         and then it's going to depend on the

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 49

```
1        arbitrator who we -- we charge with making a

2        decision on that.  And that third bullet point

3        really is a subjective value based on -- on

4        the arbitrator's experience and, you know,

5        thoughts on the matter.

6             So in terms of that, I'm saying, you

7        know, I can't say how bad this is, because I

8        haven't seen the vehicle.  I do know it's not

9        something that -- that Ford has felt is --

10       rises to that level.

11            We do feel that it's something that we

12       want to address under the terms of the new

13       vehicle limited warranty.  We do feel it's a

14       design issue, not a defect in this particular

15       vehicle, which is what's required for this

16       program.  It has to be a problem with a part,

17       you know, how a part is made, or how that part

18       was installed in the vehicle.  So either in

19       the part itself or in the manufacture, there

20       has to be something wrong.

21            In this case, we can't point to anything

22       that's wrong that we haven't addressed.  We

23       addressed some things through the technical

24       service bulletins.  But in terms of what's

25       going on with the vehicle now, we can't say,
```

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 50

1          okay, this is -- this is the fault, this is

2          what's going on.  It seems to be happening

3          across the only -- across the design line.

4          They can't -- so then it really is a design

5          issue, not a problem with this particular

6          vehicle.

7               And then, again, for the arbitrator,

8          simply the fact that, if -- if this is simply

9          a matter -- if this is a matter of it being

10         bad -- bad enough that it is doing damage to

11         our -- our customers, then we need another

12         venue for this.

13              So I -- I can -- I can empathize with our

14         customer's displeasure.  As I said, I am a

15         consumer myself.  I understand that we have a

16         problem with your vehicle; and especially when

17         it doesn't get resolved, that -- you know,

18         that that messes up your whole life,

19         essentially.  It becomes your whole point of

20         focus, and it's because you do have to use

21         that vehicle every day.

22              The question is, though:  Is -- is it

23         a -- is the issue itself, happening when it

24         does, is it a substantial enough impairment to

25         the safety, value or use of the vehicle to

Electronically signed by Emily Scott (001-198-983-7905)                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 51

1          warrant repurchase or replacement?

2               And then, in terms of -- of repairs, as I

3          said, we're working on it.  I wish I had a

4          better answer for that.  I don't, and I can

5          only apologize on behalf of Ford for that,

6          because, you know, it's obviously taking

7          longer than anybody wants, especially our

8          customers who have the vehicle.  That doesn't

9          make it a defect, however, and it doesn't make

10         it a substantial impairment that would -- that

11         would essentially be determined a

12         nonconformity, which is a substantial

13         impairment to the safety, value or use of the

14         vehicle.

15              And saying that, I understand we are here

16         because we have a disagreement, so I would be

17         surprised if we agreed on everything.  So I

18         appreciate your patience.

19              THE ARBITRATOR:  Okay.  Thank you.

20              Is there anything else from -- from you,

21         Mr. Gray?

22              MR. GRAY:  No.  Thank you.

23              THE ARBITRATOR:  I have a few questions

24         before we go down for the vehicle inspection.

25              To be clear -- and I haven't heard

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 52

1           anything different -- I count three repairs;
2           is that what everybody understands to be the
3           case?  I have invoice 513611, which was -- I
4           have January 13th to the 19th; and then I have
5           a second, 514083, and that's July 23rd to
6           August 2nd, is what I have.
7                MS. CASSIDY:  Uh-huh.
8                THE ARBITRATOR:  I believe you mentioned
9           a different date in August.  I wanted to make
10          sure that that was correct.  It says
11          August 2nd here --
12               MS. CASSIDY:  Is when we picked it back
13          up.
14               THE ARBITRATOR:  -- and that's what I'm
15          basing these days --
16               MS. CASSIDY:  That's correct, yes, sir.
17               THE ARBITRATOR:  Okay.
18               There is a repair order that doesn't seem
19          to have anything to do with this vehicle
20          problem.  It's repair order 526806 on -- in
21          April of 2014 that says, battery condition is
22          good.  It looks like some kind of general --
23               MS. CASSIDY:  I may have gone --
24               THE ARBITRATOR:  -- inspection.
25               MS. CASSIDY:  I may have gone for my

Electronically signed by Emily Scott (001-198-983-7905)                                      97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 53

1          normal oil change and tire rotation.  That may

2          be what that is.

3               THE ARBITRATOR:  That's what this looks

4          like, so --

5               MS. CASSIDY:  And then in September was

6          the last one.

7               THE ARBITRATOR:  And that would be

8          267312, and that was September 10th to 11th.

9               MS. CASSIDY:  Yes.

10               THE ARBITRATOR:  And so, at that point,

11          I'm counting -- and because I'm counting the

12          day that it was brought in when I'm looking at

13          days out of service, and the day it was picked

14          up, so I'm counting a total of 21 days out of

15          service for this vehicle --

16               MS. CASSIDY:  Yes.

17               THE ARBITRATOR:  -- for any vehicle

18          problem.

19               Does that make sense with everybody?

20          Does anybody have anything to -- to disagree

21          with that?

22               MR. GRAY:  No, that's all I have.

23               MS. CASSIDY:  No, sir.

24               THE ARBITRATOR:  Okay.  Mr. Gray?

25               MR. GRAY:  Yes.

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 54

```
 1              THE ARBITRATOR:  Can you explain to me
 2         the difference between what Ford would
 3         consider a design flaw and a manufacturing
 4         defect or a nonconformity?
 5              MR. GRAY:  Okay.  Well, to put it as
 6         simply as I can, a design issue is -- is
 7         something that is across -- across the line
 8         of -- of an entire model line.  It's something
 9         that's brought about by the way that the
10         vehicle was designed.
11              A defect, on the other hand, is -- is a
12         problem with -- with a specific part.  Say,
13         for example, if you had -- the only thing that
14         comes mind right off is a carburetor, and we
15         don't use those anymore, but let's say a
16         suspension component.  So there is a problem
17         with the -- with how it was manufactured in a
18         particular plant or somebody wasn't paying
19         attention when they put it in, right, that
20         that caused -- caused problems and wasn't
21         properly addressed.  That would be a defect.
22              So the issue with -- with the program is
23         right there in the beginning of the -- the
24         guidelines under -- under eligible cases.
25         Basically, it needs to be a problem with a
```

Electronically signed by Emily Scott (001-198-983-7905)   97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 55

```
1          part, as I said, some -- some way that the

2          part was mismanufactured or -- or a problem

3          with the quality of the component that caused

4          problems, you know, something that was molded

5          wrong or something like that --

6               THE ARBITRATOR:  May I interrupt you?

7               MR. GRAY:  -- or that was -- or that it

8          was installed wrong.

9               THE ARBITRATOR:  Mr. Gray, where do you

10         see that in the --

11              MR. GRAY:  That should be the first --

12              THE ARBITRATOR:  You are talking about

13         the program summary?

14              MR. GRAY:  Yes.

15              THE ARBITRATOR:  Okay.  Where do -- where

16         do you see that, that it needs --

17              MR. GRAY:  Let me -- let me bring that

18         up.

19              I believe it's right under eligible --

20         eligible claims --

21              THE ARBITRATOR:  Okay.

22              MR. GRAY:  -- about -- a little less than

23         three quarters of the way down -- or a little

24         more than three quarters of the way down on

25         the page, the first page of the program
```

Electronically signed by Emily Scott (001-198-983-7905)                                         97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 56

```
 1        summary guidelines.

 2             THE ARBITRATOR:  Okay.

 3             MR. GRAY:  Eligible claims:  Claims must

 4        be based on a defect in the vehicle's

 5        factory-supplied material or workmanship

 6        covered by the applicable Ford US new vehicle

 7        limited warranty.

 8             THE ARBITRATOR:  Okay.  I'm -- Mr. Gray,

 9        I get your broad point about defects versus

10        design flaws.  This -- this eligible claim

11        language is written pretty generally.  I mean,

12        it's written so that it could be argued either

13        way, whether, say, something like this might

14        be a defect or a design flaw.

15             MR. GRAY:  I -- I understand your point.

16             THE ARBITRATOR:  But your argument is

17        this is -- that -- if I understand correctly,

18        that, A, this is a design flaw that's

19        broad-based over a whole model line that Ford

20        is aware of and is trying to come up with a

21        fix, based on a faulty design --

22             MR. GRAY:  Correct.

23             THE ARBITRATOR:  -- that has something to

24        do with the air-conditioning and acceleration

25        and exhaust fumes --
```

Electronically signed by Emily Scott (001-198-983-7905)                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 57

```
 1            MR. GRAY:  Right.
 2            THE ARBITRATOR:  -- and -- and not
 3       related to a defective part or installation of
 4       part --
 5            MR. GRAY:  Correct.
 6            THE ARBITRATOR:  -- from a factory.
 7            Is -- would that be a fair restatement of
 8       your argument?
 9            MR. GRAY:  Yes.
10            THE ARBITRATOR:  Okay.
11            MR. GRAY:  That part of Ford's argument,
12       yes.
13            THE ARBITRATOR:  So you -- I believe you
14       had something to say, Mr.-- Mr. Cassidy.
15            MR. CASSIDY:  My wife keeps on telling me
16       to just, you know, not -- not say anything.
17       I -- you know, I just wanted to rebut.
18            He is saying, you know, design flaw.  I
19       don't know anything about this, because I'm a
20       former law enforcement guy here, you know.
21            But on the TSB, it clearly points out
22       that -- you know, what the part is, you know,
23       what they think the part is.  It's the HVAC
24       system, and, you know, if that's -- if that's
25       the part you want to look at, that's the part
```

Electronically signed by Emily Scott (001-198-983-7905)                                      97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 58

1          they are saying is the problem -- we've also

2          been told that it's the exhaust, the exhaust

3          doesn't extend far enough past the rear

4          bumper; that's why the fumes get, you know,

5          pulled back up into the system by the HVAC.

6               I mean, again, he could explain it better

7          than I can.  I'm just telling you, you know,

8          what I read here on the TSB.

9               THE ARBITRATOR:  Uh-huh, and therefore?

10              MR. CASSIDY:  I think it rebuts what he's

11         saying.  It is a part, you know.

12              MR. GRAY:  Right, but the TSB has been

13         completed, correct?

14              MR. CASSIDY:  The TSB has been -- has

15         been -- the vehicle -- you mean has the

16         vehicle been serviced?

17              And I guess I'm asking you that, you

18         know, since we can't talk directly to each

19         other.

20              THE ARBITRATOR:  That's fine.

21              MR. GRAY:  Well, yeah, the last TSB has

22         been performed on the vehicle, right

23         (inaudible)?

24              MR. CASSIDY:  Twice, and it failed both

25         times.

United Reporting, Inc.
954.525.2221

Page 59

1            THE ARBITRATOR:  Wait.  Twice?

2            MR. CASSIDY:  Yes, the --

3            MR. GRAY:  Two -- well, two -- one and

4        then an update of it, yes.

5            MR. CASSIDY:  No, twice.  It was done at

6        Banner Ford and when --

7            MS. CASSIDY:  Bohn.

8            MR. CASSIDY:  Excuse me, it was done at

9        Bohn Ford, and when Bohn Ford did it --

10           THE ARBITRATOR:  When was this?

11           MS. CASSIDY:  I'm sure if they were using

12       the original TSB when they did whatever they

13       did that was -- this one -- the second one

14       supersedes the first one.  I am not sure --

15           THE ARBITRATOR:  There has been one

16       repair under this TSB, is my understanding.

17           MS. CASSIDY:  That particular one, that

18       one.

19           MR. CASSIDY:  Yeah, right, but --

20           MR. GRAY:  Okay.  Well, there is still

21       (inaudible) TSB --

22           THE ARBITRATOR:  Okay.  I got it.

23           MR. GRAY:  -- so that would be the one

24       that would be done anyway.

25           My point is that it was done and the

Electronically signed by Emily Scott (001-198-983-7905)                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 60

1          condition continues to exist; therefore, it's

2          not based on that defect, as we thought it

3          might be.

4              THE ARBITRATOR:  Wait.  It's not based on

5          what?

6              MR. CASSIDY:  It's not based on that

7          defect.

8              MS. CASSIDY:  That's what he said.

9              MR. GRAY:  All right.  The TS -- the TSB

10         addresses what may be a possible defect, and I

11         don't have that -- that TSB right in front of

12         me; but, essentially, what they did was

13         they -- if you look at the -- that repair --

14         repair order --

15             THE ARBITRATOR:  Uh-huh.

16             MR. GRAY:  -- they did a reprogramming of

17         the -- of the -- the -- basically, the HV

18         heating module, replaced an air extractor,

19         both rear fender moldings and sealed the body

20         and installed lift-gate drain valves.  So they

21         thought that perhaps that was what was causing

22         it.

23             THE ARBITRATOR:  Uh-huh.

24             MR. GRAY:  However, with that performed,

25         the issue still exists; and it is existing

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                                          97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 61

```
 1          across the model line, not just this
 2          particular vehicle.
 3               THE ARBITRATOR:  Okay.  Okay.  At this
 4          time, we are going to disconnect you,
 5          Mr. Gray.  I will fax the materials that
 6          Ms. Cassidy introduced regarding carbon
 7          monoxide poisoning to you, and then we'll go
 8          down with a Better Business Bureau staff
 9          person and inspect and test drive the vehicle,
10          and then we will reconnect with you after
11          that.
12               MR. GRAY:  Okay.  Thank you very much.
13               THE ARBITRATOR:  Thank you.
14               MR. GRAY:  I'll be waiting for your call.
15               THE ARBITRATOR:  Appreciate it.
16               MR. CASSIDY:  Do you want to go with him
17          since you drive the vehicle -- you know, you
18          are more familiar with the conditions?
19               (Break in recording.)
20               MR. GRAY:  Ford Motor Company, Bob Gray.
21               UNIDENTIFIED SPEAKER:  Hi, Mr. Gray.
22          This is Lisa with the Better Business Bureau
23          of New Orleans.
24               MR. GRAY:  Yes.
25               UNIDENTIFIED SPEAKER:  Hi, we have
```

United Reporting, Inc.
954.525.2221

Page 62

 1          everybody back from the inspection and test

 2          drive.

 3               Did you receive the fax?

 4               MR. GRAY:  Yes, I did.  Thank you.  I was

 5          just going to say that.

 6               UNIDENTIFIED SPEAKER:  Okay.  Good.

 7               All right.  Well, I'm going to turn the

 8          hearing back over to Mr. Stewart.

 9               MR. GRAY:  Great.

10               THE ARBITRATOR:  Okay.  Mr. Gray?

11               MR. GRAY:  Yeah.

12               THE ARBITRATOR:  Basically, we -- we went

13          down and took a test drive on the interstate

14          under heavy acceleration with the rear

15          air-conditioner on, and there was a smell, a

16          sulfurous smell, that appeared under those

17          conditions.

18               You probably want to know the mileage.

19               MR. GRAY:  Yes, please.

20               THE ARBITRATOR:  25994.5.

21               MR. GRAY:  Excellent.  Thank you.

22               THE ARBITRATOR:  No aftermarket items, if

23          you need to know that.

24               Mr. Gray?

25               MR. GRAY:  Do I need to know that there

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                                          97a5320e-8dd9-433c-b458-f1d3ef04156c

```
 1        are none, no.

 2             THE ARBITRATOR:  Okay.

 3             MS. CASSIDY:  We did put that -- we

 4        did --

 5             THE ARBITRATOR:  Okay.  What is it?

 6             MS. CASSIDY:  It's -- it's the --

 7             MR. CASSIDY:  It came from Ford.

 8             MS. CASSIDY:  It's the -- but we --

 9             MR. CASSIDY:  The window --

10             MS. CASSIDY:  It's like a -- it's on the

11        hood, like --

12             THE ARBITRATOR:  Windshield something.

13             MR. CASSIDY:  Yeah, stone deflector,

14        whatever it's called.

15             MS. CASSIDY:  The stone deflector on the

16        hood, but we bought it through Ford after

17        purchase.

18             MR. CASSIDY:  Yeah, we bought it through

19        Ford.  We bought it with the vehicle.

20             MS. CASSIDY:  Okay.

21             MR. GRAY:  Okay.

22             THE ARBITRATOR:  Okay.

23             MR. CASSIDY:  Yeah, and it has -- it has

24        that; and then rubber -- rubber mats, too, but

25        we bought those --
```

Electronically signed by Emily Scott (001-198-983-7905)                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 64

```
 1              THE ARBITRATOR:  But that came --
 2              MS. CASSIDY:  It's not --
 3              MR. CASSIDY:  Well, it comes --
 4              THE ARBITRATOR:  That's not really
 5         aftermarket.
 6              MS. CASSIDY:  Yeah, it's okay.
 7              MR. CASSIDY:  Okay.  Oh, okay.
 8              THE ARBITRATOR:  That's part of the --
 9              MR. CASSIDY:  Yeah, Ford thing, because
10         it came with both sets of mats, the carpeted
11         and the rubber mats, so...
12              THE ARBITRATOR:  Okay.  Well, Mr. -- Mr.
13         and Mrs. Cassidy, would you like to make any
14         comments or ask any questions about the test
15         drive?
16              MR. CASSIDY:  About the test drive, no,
17         I'm -- I'm fine.  I don't have any questions.
18         I don't have any comments.  I mean --
19              THE ARBITRATOR:  Would you like --
20              MR. CASSIDY:  -- like --
21              THE ARBITRATOR:  Would you like to
22         testify as to what you witnessed?
23              MR. CASSIDY:  What I witnessed in the --
24         well, just, as you mentioned to Mr. Gray, that
25         when she was accelerating, coming back up onto
```

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 65

1          the interstate -- and, actually, I think when

2          she was, you know, going north up on I-10, you

3          could -- you could briefly smell it, the --

4          that sulfur smell.

5              And then, when she turned around, did

6          the -- you know, the return trip back to the

7          office here, under heavy acceleration coming

8          down the ramp, you could definitely smell

9          stronger in the vehicle.

10             And it's at -- for me, you know, because

11         of, you know, I'm used to it, you know, it's

12         like I want to roll the windows down as soon

13         as I smell it, you know.  So hopefully that

14         didn't effect the test at all, but --

15             THE ARBITRATOR:  Okay.

16             MR. CASSIDY:  -- I think that's all I

17         have to say about it.

18             I mean, it's -- it's noticeable, and it's

19         noticeable under, you know, even the lightest,

20         you know, acceleration.  Like I said, you

21         noticed it -- I noticed it right off the bat,

22         as soon as she, you know, jumped up on the

23         interstate heading north.

24             THE ARBITRATOR:  Okay.  Do you have

25         anything, Ms. Cassidy?

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 66

1            MS. CASSIDY:  As the primary driver of

2        the vehicle, I will -- it is -- I am of the

3        opinion that what we experienced today is not

4        the strongest that I've smelled at times.  I

5        mean, I did -- I smelled it in the front of

6        the vehicle, but it wasn't an overwhelming,

7        where I -- you know, I felt like I'm

8        lightheaded and dizzy.

9            THE ARBITRATOR:  Okay.

10            MS. CASSIDY:  So, yes, I experienced it

11        today; but in my opinion, it's not as bad as

12        it can be at times.

13            THE ARBITRATOR:  Okay.

14            MS. CASSIDY:  But I would have still put

15        the windows down at that point, because I

16        could smell it.

17            THE ARBITRATOR:  Okay.  Mr. Gray, do you

18        have any questions or comments?

19            MR. GRAY:  No, I don't.

20            THE ARBITRATOR:  Okay.  Does anybody --

21        Mr. Gray has received the fax.

22            Is there any reason -- I don't need a

23        recess.  Is there any reason why any of the

24        parties want to take a recess right now?

25            MR. CASSIDY:  We do not, no.  We're good.

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 67

1           MS. CASSIDY:  No.

2           MR. GRAY:  No, I'm fine, too.  Thank you.

3           THE ARBITRATOR:  Okay.  And, again -- and

4      that's in the interest of not disconnecting

5      you from the phone for five minutes again and

6      so on.

7           MR. GRAY:  Right.

8           THE ARBITRATOR:  So, at this time, if

9      either party has any final testimony, evidence

10      or witnesses, now is the time, ten minutes.

11          This is not a summary.  This is if you

12      have anything further that you'd like to bring

13      up that's a -- that's a point that maybe

14      wasn't adequately addressed, or something

15      you've forgotten, something like that.

16          MR. CASSIDY:  I think I am fine.  I mean,

17      insofar as witnesses, I mean, you guys can

18      talk to, you know, the Don Bohn folks about

19      the vehicle, and I'm sure you will (inaudible)

20      folks.

21          THE ARBITRATOR:  Well, witnesses would

22      be --

23          MR. CASSIDY:  Yeah, right.

24          THE ARBITRATOR:  -- would be people you

25      brought in to testify --

Electronically signed by Emily Scott (001-198-983-7905)                                        97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 68

```
 1          MR. CASSIDY:  No, just --
 2          THE ARBITRATOR:  -- or you yourselves are
 3      witnesses.  That's what I mean when I say
 4      "witnesses."
 5          MR. CASSIDY:  We're good.  I think you've
 6      heard everything from us, you know.  Except
 7      for the summation, you know, you've heard
 8      everything from us that we have to say about
 9      the vehicle.
10          It is a nice vehicle, though, Mr. Gray.
11          MR. GRAY:  Good.  I'm glad.  Thank you.
12          MR. CASSIDY:  It is.
13          THE ARBITRATOR:  Mr. Gray, any -- any
14      final testimony, evidence or witnesses?
15          MR. GRAY:  Yeah, I do just want to talk
16      about this article briefly.
17          I would know -- first of all, it's not
18      from the NH -- NHTSA; it's from a blog --
19          MR. CASSIDY:  Yes.
20          MR. GRAY:  -- from a lemon law lawyer.
21      So it -- to me, it's just interesting, and
22      I'll just bring it to your attention, that
23      this was written -- you know, they quote the
24      lady from the NTHA (sic) back in June 20th of
25      2014; at that time, they hadn't taken any
```

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 69

1          action.  They still haven't taken any action.

2          So they are aware of it, but yet they haven't

3          felt that it's risen to the level of -- of

4          needing to do anything about it.

5               I would note, again, that, yeah, this

6          is -- the lawyer that wrote this is from Krohn

7          & Moss.  It's a group that we're very aware

8          of, a group of lawyers, in that it's pretty

9          much what they do is lemon law cases and BBB

10         Auto Line cases --

11              MR. CASSIDY:  Okay.

12              MR. GRAY:  -- against the manufacturers.

13              So when you hear a headline like

14         "Potentially Lethal Carbon Monoxide

15         Emissions," it's startling, and it's meant to

16         be, because it's meant to bring business

17         into -- into the lawyers, people trying to get

18         their vehicles bought back.  So it's -- it's a

19         little bit of -- of extremism in Ford's

20         opinion, and -- and, again, there hasn't been

21         any action taken by NTHA (sic).

22              So I just wanted to note that, that it

23         wasn't a NHTSA article; it's an article by an

24         attorney.

25              THE ARBITRATOR:  Okay.  Noted.

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 70

```
 1           MR. GRAY:  And that's all I have in terms
 2      of further testimony.
 3           THE ARBITRATOR:  Okay.  I have a couple
 4      of final questions.
 5           It's pretty obvious that it was brought
 6      in three times in which the problem was either
 7      mentioned or -- or addressed.  There is two
 8      times when it seemed to have been -- when
 9      they -- when Ford attempted to fix it, and
10      then one time it just appears to have been
11      mentioned but nothing was done.
12           Is there anything else, in terms of -- in
13      terms of making the vehicle subject to repair,
14      as it says in the manufacturer's program
15      summary --
16           MR. CASSIDY:  Talk to him --
17           THE ARBITRATOR:  -- other than those
18      three times?
19           MR. CASSIDY:  Talk to him about the --
20      the service area rep was supposed to look at
21      it, and then that was supposed to be the
22      fourth fix, but he chose --
23           MS. CASSIDY:  Right.  Well, Ford had sent
24      a letter to the business -- Better Business
25      Bureau and us, after we contacted you guys,
```

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 71

1        about the Ford service engineer for the

2        region --

3                THE ARBITRATOR:  That was last fall, and

4        what was that about?

5                MS. CASSIDY:  That he was supposed to

6        look at it in December.

7                THE ARBITRATOR:  Okay.

8                MR. CASSIDY:  That would have been the

9        fourth one.

10               THE ARBITRATOR:  Wait.  December --

11               MS. CASSIDY:  Of 20 --

12               THE ARBITRATOR:  -- who was supposed to

13       look at it?

14               MS. CASSIDY:  The local -- I think it's

15       Ford service field --

16               MR. CASSIDY:  Engineer.

17               MS. CASSIDY:  -- engineer.  He may be

18       able to tell us the correct term.

19               THE ARBITRATOR:  The field service

20       engineer.

21               MS. CASSIDY:  Engineer was supposed to

22       take it in December.  That was one of their

23       responses, which that never happened.

24               MR. CASSIDY:  Yeah, and that would have

25       been the fourth time that it would have been

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 72

```
 1        looked at, but he chose not to see it.

 2             THE ARBITRATOR:  Why was that, as far as

 3        you know?

 4             MS. CASSIDY:  Well, the -- this lady,

 5        Cherie, that called me from Ford --

 6             THE ARBITRATOR:  Right.

 7             MS. CASSIDY:  -- said that he emailed her

 8        to say the fix is going to be January 15th --

 9             THE ARBITRATOR:  Okay.

10             MR. CASSIDY:  And here it is past

11        January 15th --

12             MS. CASSIDY:  So, I mean, we did --

13             MR. CASSIDY:  -- and it's not --

14             MS. CASSIDY:  You know, I don't know.  He

15        told me to bring it up; maybe I shouldn't.

16             THE ARBITRATOR:  Okay.  Mr. Gray, what

17        about the general fact that if Ford had a fix,

18        you know, it would have been addressed or

19        attempted to be addressed, subject to repair,

20        in December; but the fact that the consumers

21        are not satisfying the program criteria for

22        repurchase or replacement specifically related

23        to number of repair attempt -- it's not repair

24        attempts, it's "subject to repair" is the

25        language, is because Ford does not know how to
```

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 73

1      fix the vehicle?

2           MR. GRAY:  Well --

3           THE ARBITRATOR:  That --

4           MR. GRAY:  -- in terms of that being a

5      fourth repair, yes, that's a possibility; and

6      I'll let you, you know, give that the weight

7      that it -- that it deserves.

8           I would state that the guidelines do say

9      four or more repair attempts with it

10     continuing to exist, where it helps that if it

11     was to be subject to repair again, it would be

12     repaired, so it would really depend on the

13     outcome of -- of that repair attempt.

14          THE ARBITRATOR:  Well, it says "subject

15     to repair."  I'm -- I'm referring to the

16     specific language that Ford uses, "subject to

17     repair," not "repair attempts."

18          MR. GRAY:  Right.  Okay.

19          THE ARBITRATOR:  And so I am just

20     bringing that up, and I wanted to know if you

21     had anything to say about that, in terms of

22     what might constitute a vehicle being subject

23     to repair?

24          MR. GRAY:  Um, well, normally, it's --

25     you know, it's taken into a dealership and

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 74

1          examined, you know.  The complaint is -- is --

2          is stated.  It's given the opportunity to be

3          repaired.

4               THE ARBITRATOR:  Uh-huh.

5               MR. GRAY:  I will -- you know, to me,

6          that would constitute a repair attempt or a --

7          or a -- whichever -- whichever phrase we're

8          using, and that hasn't taken place.

9               THE ARBITRATOR:  Okay.  I would ask the

10         consumers if they have anything to say about

11         the exclusionary language?

12              I believe -- you received a copy of the

13         program summary?  There is exclusionary

14         language on the last page that states:  Claims

15         that are not eligible -- I know you've seen

16         this and heard this -- claims involving a

17         vehicle defect, if the customer alleges,

18         either as part of the BBB Auto Line claim or

19         at any other time, that the vehicle defect

20         has, one, caused bodily injury...

21              Can you discuss that with regard to your

22         allegations, that the vehicle is causing you

23         headaches and so on and -- and you're

24         concerned about the health effects of the

25         vehicle's problems?

Electronically signed by Emily Scott (001-198-983-7905)                                        97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 75

```
 1          MS. CASSIDY:  All I can do is tell you
 2      that that's what I experience after inhaling
 3      what was in the cabin of the -- of the
 4      vehicle.
 5          THE ARBITRATOR:  Uh-huh.
 6          MS. CASSIDY:  I'm concerned that over the
 7      time -- because, obviously, if I -- if I took
 8      a pipe and put it in my car and turned my car
 9      on, it wouldn't take long.
10          THE ARBITRATOR:  Uh-huh.
11          MS. CASSIDY:  But over time, I'm getting
12      these slow doses.  I don't know if it's making
13      me sick.  I'm concerned that it is making me
14      sick, and I'm not going to know until several
15      years down the road.
16          MR. CASSIDY:  Well, to put a finer point
17      on that, it is making her ill, because it is
18      causing her headaches and nausea and
19      lightheadedness, and that's being a direct
20      effect of the -- of the carbon monoxide that's
21      coming inside the cabin, which Ford can't fix
22      and doesn't have a fix for it.
23          He freely admits that there's a problem,
24      and he freely admits that there is no fix for
25      this vehicle; and regardless of how many
```

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 76

1        attempts we've made, they don't have a fix for

2        it.  We could have driven it there a hundred

3        times, and a hundred times they would have

4        told us there is no fix for this vehicle.

5             MS. CASSIDY:  I mean, I can leave here

6        today, Mr. Stewart and Mr. Gray, and drive to

7        the dealership and say, fix it; and they are

8        going to tell me, I can't fix it.  I already

9        know that; I called --

10            MR. CASSIDY:  Well, we already -- yeah,

11       we know; we called this morning.

12            MS. CASSIDY:  -- this morning.  I called

13       the last -- I called the 15th, 16th, the

14       17th and --

15            MR. CASSIDY:  There's no fix.

16            MS. CASSIDY:  -- yesterday, so --

17            THE ARBITRATOR:  Okay.

18            MS. CASSIDY:  -- that, to me, is a moot

19       point.

20            MR. CASSIDY:  What other due diligence do

21       they want us to do?  Does he want us to drive

22       there today?  We'll do that, and they can have

23       it for the week.

24            MS. CASSIDY:  They can keep it until they

25       fix it.

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 77

```
 1              THE ARBITRATOR:  Right.
 2          MS. CASSIDY:  I mean, it makes no sense
 3      to me.
 4              THE ARBITRATOR:  I got that.
 5          I'm talking specifically about this
 6      exclusion --
 7          MS. CASSIDY:  I'm sorry, yes.
 8              THE ARBITRATOR:  -- right now concerning
 9      an allegation of bodily injury, if that is
10      what you're alleging.
11          MS. CASSIDY:  I'm saying that I don't --
12      I won't know --
13              THE ARBITRATOR:  Right.
14          MS. CASSIDY:  -- possibly for years
15      whether it's caused me an issue or a problem.
16      I'm concerned about that that's going to
17      happen.  I don't -- I can't -- I haven't been
18      to a doctor.
19              THE ARBITRATOR:  Okay.
20          MS. CASSIDY:  All I can say is, when I
21      get out of the vehicle, my headache goes away
22      within a few minutes; and I'm certainly not
23      nauseated when I put the windows down and all
24      the smoke goes out -- I mean the exhaust goes
25      out.
```

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                                                                97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 78

```
 1          THE ARBITRATOR:  Okay.  Okay.  I don't
 2     have anything else.
 3          Mr. Gray, I have one more question.
 4          MR. GRAY:  Sure.
 5          THE ARBITRATOR:  I think I know the
 6     answer to this, but do you know when a fix
 7     will be made available?
 8          MR. GRAY:  The last one I heard from
 9     the -- from the field service engineer was --
10     was supposed to be January 15th.  He may have
11     been referring to -- sometimes they put it out
12     to the field service engineers an advance --
13     you know, an advance copy of it before it goes
14     out to dealerships.  So that may have been his
15     day, so he may have it already.
16          But I do know that it's supposed to be
17     very soon, and I know that's something that
18     the customers have heard before so -- but the
19     last word I heard was that the FSE was
20     supposed to have it as of the 15th.
21          THE ARBITRATOR:  Okay.  And you say that
22     may be a dissemination to field service
23     engineers and not to dealerships?
24          MR. GRAY:  Correct.
25          THE ARBITRATOR:  That that may be what
```

Electronically signed by Emily Scott (001-198-983-7905)                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 79

1          the date was supposed to be, the release day

2          of that?

3                MR. GRAY:  Correct.

4                MR. CASSIDY:  (Inaudible).

5                MS. CASSIDY:  Uh-huh, well, he has a copy

6          of that in the record.

7                THE ARBITRATOR:  Okay.  I don't have

8          anything further.

9                At this time, beginning with the

10         Cassidys, if you would like to make a

11         five-minute closing, you have an opportunity

12         to do so.

13               MR. CASSIDY:  I guess I'll handle the

14         closing, because she's a little emotional, and

15         I won't -- I won't take five minutes.

16               I just want to, you know, bring up, you

17         know, the point again:  They admit there is

18         a -- there is a problem.  They admit there is

19         no fix for the problem.

20               In his words, he admitted that it was a

21         defect; those were his words, Mr. Gray's

22         words.  And I agree with him; it is, you know,

23         a defect.

24               How long do they want us to wait on this,

25         you know?  The TSB, the initial one, has been

Electronically signed by Emily Scott (001-198-983-7905)                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 80

```
 1          out for quite a while.  Are we going to
 2          continue to wait another year, another two
 3          years before there is no value of this
 4          vehicle, you know, for trade-in or what --
 5          what have you?
 6               You were -- you were concerned or there
 7          were some concerns about whether it's causing
 8          bodily harm.  The bodily harm is the headaches
 9          and nausea.  It could cause her to, you know,
10          become ill, you know, and to have an accident,
11          you know.  We won't know that.
12               Is -- is there in going to be any
13          long-term ramifications or any long-term
14          illness from this?  Again, like she said, you
15          know, without going to see a doctor, we
16          wouldn't know; but we all know what the
17          effects of carbon monoxide, you know, can be.
18          It's lethal.  It can kill you.
19               I don't think I have anything else I need
20          to -- need to say, because everything is else
21          is just you -- you beating the same drum over
22          and over and over again.  I think we've made
23          our -- our case.  We've stated our position,
24          and that's all I have to say.
25               Do you have anything you want to add to
```

Electronically signed by Emily Scott (001-198-983-7905)                                                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 81

1          that?

2              MS. CASSIDY:  Well, I guess the last

3          thing that I would like to add is that, again,

4          we own four Ford vehicles, and I feel like

5          we've placed a lot of faith in Ford to fix the

6          problem.

7              This, in fact, is the last Ford -- no,

8          the second to last Ford vehicle that we owned,

9          so it's not like we are just out to get Ford

10         or out to be malcontents or complainers.  We

11         have been very patient and done our due

12         diligence to give them the opportunity to take

13         care of the issue; and, in my opinion, they've

14         continued to fail to take care of what I think

15         is their responsibility to fix the vehicle.

16             THE ARBITRATOR:  Okay.

17             MS. CASSIDY:  And that's all we wanted

18         from the get-go was fix the vehicle.

19             But at this point, if we can't fix it, we

20         feel like we've been patient enough, and we

21         would like them to have their -- their vehicle

22         back.

23             THE ARBITRATOR:  Is that it?

24             MS. CASSIDY:  Yes, sir.

25             THE ARBITRATOR:  Mr. Gray?

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 82

1          MR. GRAY:  Yes.  Well, thank you, and I'm

2       (inaudible) I can definitely agree with the

3       Cassidys; they have been very patient.  It's

4       an issue that they have, you know, been aware

5       of for quite some time and have dealt with.

6          It's -- it's really quite a dichotomy.

7       On one level, I look at this and I go, okay,

8       if you listen to the article by the attorney,

9       we start hearing things like "potentially

10      lethal carbon monoxide emissions," it -- you

11      know, it's scary; and you start to get other

12      ramifications of what that might mean, and

13      that's even scarier.

14         But if that's the case, and if the

15      customer is experiencing nausea and

16      lightheadedness and feels that it may cause

17      her to have an accident, then there is that

18      exclusionary clause.  Ford would say that this

19      isn't the place for that, that sort of action.

20         If it -- if it's not at that level, then

21      Ford says that it's not substantial enough to

22      repurchase or replace the vehicle.

23         In terms of the repair, as I said, as

24      soon as it's there, we would love to get this

25      vehicle fixed; and I know, in speaking to the

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 83

1          field service engineer, he feels that way.

2          I'm sure the dealership feels that way.  I'm

3          sure our customers feel that way.

4              But when we look at the guidelines of the

5          program, as -- as we have to, I would just

6          state several things.  First of all, there is

7          that exclusionary clause -- clause, I know,

8          that was written by a lawyer who was looking

9          to make money, so he wants more customers.

10             But then there is the issue, you know, as

11         I said, of it being product liability.  There

12         is the question of, is this a design issue?

13         Is this a defect?  There is another fine line

14         there that, you know, this is happening across

15         the -- the Explorers over a number of years.

16         It -- it doesn't seem to be a problem with an

17         individual part or an individual vehicle that

18         was misbuilt.  It does seem to be a design

19         issue.  Ford feels it's that way.  We still

20         want to resolve it, but we don't feel that it

21         fits this program.

22             And then -- and then the last thing is,

23         is we come to, when we look at the guidelines

24         of the program, it does say four or more, you

25         know, times for it to be presented for -- for

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 84

1    work to be done.  We have three, and we don't

2    have the days out of service.  Normally that

3    would -- would cause me alone, in itself, to

4    say the vehicle is not eligible for repurchase

5    or replacement, but there are questions there,

6    as well.

7        Ford obviously has its own opinions in

8    terms of whether this is a vehicle that should

9    be bought back or should not.  We don't feel

10   that it should for all the reasons discussed.

11       I think that the Cassidys have done a

12   very good job of stating their case, as well.

13   So I want to thank them; and given the

14   emotions involved, I want to thank them for

15   being polite and kind to me.

16       But in terms of -- of looking at the

17   guidelines just as the guidelines, taking the

18   emotion out of it, I think there is very --

19   some very big problems with this case in terms

20   of -- of requiring a repurchase or replacement

21   from Ford.  I think -- when you look at those,

22   I think, in total, it's a vehicle that we just

23   don't feel should be repurchased or replaced,

24   and so we are seeking a denial.

25       In terms of the request for repairs, as

Electronically signed by Emily Scott (001-198-983-7905)                          97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 85

1          soon as we can get it -- get them done, as

2          soon as we have a robust fix, something that's

3          going to actually do the job, we would love to

4          get it done.  That should be very soon.

5              I know that that's what the customer was

6          told, you know, all those months ago; but we

7          do feel that we've taken steps along the way.

8          We have come out with the two technical

9          service bulletins trying to address it, and we

10         do want to get it fixed.  So we are not saying

11         no to a repair; we are just saying we have to

12         have the fix first.

13             In terms of repurchase or replacement, we

14         don't feel that the vehicle meets the

15         guidelines for all the reasons stated.  I

16         won't go back into all of them.

17             But, again, my thanks to everybody, and

18         I'll leave it at that.

19             THE ARBITRATOR:  Okay.  Thank you,

20         Mr. Gray.

21             Thank you all for participating.  This

22         concludes the hearing.

23             As I stated earlier, I'll submit a

24         written decision within three days.  You all

25         should receive it by early next week, I would

United Reporting, Inc.
954.525.2221

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

```
                                              Page 86
 1         imagine.
 2              Thank you for participating and have a
 3         good day.
 4              MS. CASSIDY:  Thank you.
 5              MR. CASSIDY:  Thanks very much.
 6              Thank you, Mr. Gray.
 7              MR. GRAY:  Thank you all.  Goodbye.
 8              THE ARBITRATOR:  Bye.
 9              (Whereupon, the recording was concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Electronically signed by Emily Scott (001-198-983-7905)                    97a5320e-8dd9-433c-b458-f1d3ef04156c

Page 87

C E R T I F I C A T E

THE STATE OF FLORIDA)
COUNTY OF BROWARD)

          I, EMILY SCOTT, certify that I was

authorized to and did stenographically transcribe

the foregoing proceedings from audio file to the

best of my ability and that the transcript is a true

and complete record of my stenographic notes.

          Dated this 31st day of March, 2015.

_____
EMILY SCOTT

United Reporting, Inc.
954.525.2221